Edward Anthony ELLIS, Appellant,

v.

The STATE of Texas, Appellee.

No. 69210.

Court of Criminal Appeals of Texas,
En Banc.

July 2, 1986.

Frumencio Reyes, Jr., Renato Santos, Jr., Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., and James C. Brough, Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under Art. 37.071(b), V.A. C.C.P. Punishment was assessed at death.

Appellant challenges the sufficiency of the evidence to prove one of the elements of the aggravating offense of burglary; specifically, that appellant's entry of the victim's apartment was without her effective consent.[1] See V.T.C.A. Penal Code Sec. 30.02(a).

There were no eyewitnesses to the offense. No one saw appellant enter or leave the apartment. The evidence was circumstantial. However, the standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases: to view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Garrett v. State,* 682 S.W.2d 301 (Tex.Cr.App.1984); *McGoldrick v. State,* 682 S.W.2d 573 (Tex.Cr.App.1985); *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979). Lack of consent to enter is an element of burglary that may be proven by circumstantial evidence. *Prescott v. State,* 610 S.W.2d 760, 763 (Tex. Cr.App.1981).

The deceased was a seventy-four year old woman who lived alone in an apartment complex in Houston. Appellant had been the maintenance man at the complex, and as such had access to master keys to all the apartments. Sometimes he went alone to have copies of keys made for the manager. Appellant was fired from his job a few months before the offense. The day he moved out of the apartments the office was broken into and some keys stolen. Some of the apartment locks in the complex were rekeyed after this burglary, but the one on the deceased's front door was not among them. Some time after appellant's firing

the deceased's apartment was painted, including her front door. She also hired a neighbor of hers to thoroughly clean her apartment once a week, including scrubbing the inside of the front door. The neighbor, Susan Canales, testified at trial that she had last given the door such a cleaning approximately a week and a half before the offense. After the victim's death appellant's fingerprints were found on the inside of her apartment front door.

Jewelry was stolen in the burglary of the deceased's apartment and her car was taken as well. A witness testified that a few days after the offense appellant had been trying to sell jewelry and a car matching the description of those items taken in the burglary.

Susan Canales, the neighbor who cleaned the deceased's apartment, was also a good friend of the deceased's who saw her or talked to her nearly every day. Knowing that appellant had had access to the master keys and that he had been seen in the neighborhood of the apartments at least once since his firing, Canales had warned the deceased and made her promise that she would not open her door to appellant if he appeared. Over the years of their friendship, Canales testified, the deceased had never broken a promise to her.

In addition the jury heard testimony from Bill Scott, who had been incarcerated with appellant in the Harris County Jail while both were awaiting trial on unrelated charges. (Before the instant trial Scott was acquitted of the attempted murder with which he had been charged; there was no charge pending against him at the time of trial and no deal had been made in exchange for his testimony.) Scott testified that appellant had admitted to him that he had committed the burglary and murder, having gone to the deceased's apartment with the intention of stealing money and jewelry. The jury could readily have inferred that the deceased would not willingly have admitted him for that purpose, and that therefore his entry must have been without her consent or that her con-

---

1. A treatment of this ground of error prepared by Judge Clinton is adopted.

sent was induced by fraud or force. V.T. C.A. Penal Code, Sec. 1.07(a)(12)(A). The evidence was sufficient for a reasonable trier of fact to have found that appellant entered the deceased's apartment without her effective consent. Ground of error one is overruled.

■ In his third ground of error, appellant contends that the trial court excluded prospective juror Bradshaw in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We set out the pertinent portions of the voir dire, as follows:

"Q. [Trial Court] ...

"Now, the question I must ask you at this time is whether or not you have any religious, moral, or conscientious scruples or any scruples of any sort, for that matter, against the infliction of death as a punishment for a crime in a proper case?

"A. I couldn't say that a man should die for something; no.

"Q. I understand what you are saying and I can see your face and we can see your reaction to the question but the record we are taking down cannot. The little lady is taking everything we say down and it doesn't show the things that we see so we have to have a yes or no answer.

"Would you like me to give you the question again?

"A. No. I couldn't say sentence a man to death or be part of it.

"Q. Now, that gets us into—when you say no, that gets us into another area. Let me give you the question again and you say yes or no to it.

"A. All right.

"Q. Do you have any religious, moral, or conscientious scruples or any scruples of any sort, for that matter, against the infliction of death as a punishment for a crime in a proper case?

"A. Yes.
"...

"A. The way I feel about it—say, if he did take someone's life, taking his life is not going to bring him back. So that's the eye for an eye thing and I just—

"Q. [Prosecutor] You go for the two wrongs don't equal a right?

"A. That's right.

"Q. Now, I take it that's a pretty strong feeling you have; is that correct?

"A. Ever since, you know, I have been old enough and all to really think about it I have felt that way so I would say yes.

·     ·     ·     ·     ·

"Q. [Prosecutor] ...

"The question I want to ask you: Keeping in mind your feelings about the death sentence and the rightness or the wrongness of the death sentence, would you always in every case answer one of these questions no in order to prevent the Judge from assessing the death penalty?

"A. I believe so.

"Q. Okay. Remember the Judge asked you for a yes or no answer because of the record and only you can tell us what is in your mind.

"Let me put it in this light. Are you so against the death penalty that you would always answer one of these questions no in order to prevent the death sentence from being assessed?

"A. Yes.

"Q. In every case?

"A. Yes.

"Q. And I take it, that's a very strong feeling, as you said, since you have been old enough to think; is that correct?

"A. Yes.

"Q. Now, I'm not going to try to change your mind but let's say I did try to change your mind. Could anybody in this courtroom change your mind about your feeling on the death penalty?

"A. No.

"Q. ...

"But if you are selected for a jury, if you are qualified for a jury, you have to take an oath [2] to follow the law and once you have taken an oath it's not like a job that you can quit and say, 'Hey, this is not what I bargained for. I will find me another job. Can't do it.' You are stuck until the end of trial. You may end up doing something that does violence to your insides or your conscience or your soul or your morals or ethics or whatever and we don't want that to happen but the law will not require you to take that oath if you cannot live up to the oath. Do you see what I am saying—if it is going to do violence to you.

"The question I want to ask you is: Considering your feelings about the death sentence and given the choice of taking that oath or not taking the oath in a capital murder, would you refuse to take the oath?

"A. Yes.

". . .

"Q. [Defense Counsel] My question to you, Mr. Bradshaw, is if you were selected as a member of the jury could you set your feelings aside and be able to answer Special Issues 1 and 2 after hearing the evidence?

"A. I guess you want a yes or no on that?

"Q. Yes.

". . .

"Q. If you were selected as a member of the jury, could you along with the other jurors after the State having proved to the members of the jury at the guilt or innocence phase of the trial could you thereafter be able to answer Special Issues 1 and 2 provided it is proven to you beyond a reasonable doubt?

"A. Yes. I could answer them.

". . .

"Q. . . .

"If the State proved to you beyond a reasonable doubt, you as a member of the jury, beyond a reasonable doubt that these special issues should be answered yes, could you answer this yes?

"A. Yes.

"Q. . . .

"Now, I'm not asking you about in this particular case, in that case about the kidnapper and murderer of the campfire girls. If you can think of a crime to be so heinous that you could tell or you could answer the question yes to the Special Issue?

"A. Can I say yes? I could answer yes to both of them but I don't think, you know, he should get—they should get punished but, you know, death.

". . .

"THE COURT: . . .

"What they are concerned about if you were on Question 2 and you knew if you answered Question Number 2 yes and you already answered Question Number 1 and if the State proved to you beyond a reasonable doubt that the answer to Number 2 should be yes and in your own mind you know that it should be yes—they proved it to you beyond a reasonable doubt that you should answer Question Number 2 yes, however heinous the crime is—would you vote yes knowing that I am going to assess the death penalty?

"THE VENIREMAN: Yes, I would. I would tell the truth. Yeah. What I thought was right. Yes.

"THE COURT: So then what you said earlier about having some scruples against the death penalty are not exactly what you led us to believe they are?

"THE VENIREMAN: Well, I'm not going to lie, you know. If both things are yes and that's the only choice I have and it's been proven I have to answer yes and be honest with the Court and what I know is right as far

---

2. The oath referred to at this point and thereafter in the voir dire is that of Art. 35.22, V.A.C. C.P.: "You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render according to the law and the evidence, so help you God."

as the facts in my head, I have to answer yes.

"THE COURT: So then if you took the oath, if you had a choice of taking that oath to follow the law knowing full well what you have said to us about your feelings about the death penalty, are you telling me now that you would or would not?

"THE VENIREMAN: I would not take the oath.

"THE COURT: You would and could take the oath?

"THE VENIREMAN: I would not take the oath. Either I don't understand or you don't understand. What I am saying if I had to take the oath for some reason and I was in that situation and I saw the facts and it was true I would say yes. But—I would try to avoid taking the oath because I just can't see sentencing someone to death if the situation arose.

"THE COURT: Okay. The situation will arise if you are chosen as a juror in this case. You will have to vote yes or no. There is no two ways about it. And you know if you take the oath that you will a true verdict according to the law and the evidence submitted to you, that you are going to have to answer those questions one way or another. And the question they are trying to determine is if it gets down to answering those questions and you have already taken the oath now, you see what I am saying? And you have got to answer those questions one way or another and you have got some feelings against the death penalty and at one point in time you said you don't believe in the death penalty.

"THE VENIREMAN: I don't but I have to tell the truth, too.

"THE COURT: What you are saying—

"THE VENIREMAN: I'm going to follow it.

"THE COURT: No matter whether it does injury to your conscience and your soul or not?

"THE VENIREMAN: If that's what I have to do because—

"THE COURT: You don't have to.

"THE VENIREMAN: I'm not going to lie.

"THE COURT: You don't have to. If your feelings are so strong—we are trying to find out how strong your feelings really are and we are not arguing about it.

"THE VENIREMAN: I understand that.

"THE COURT: We need to find out how strong your feelings really are. If your feelings are strong enough that if you take the oath and you are going to follow your oath and it is not going to do damage to your own conscience and your own soul and if you are convinced beyond a reasonable doubt both of those questions should be yes knowing full well if you answer them yes that I am going to assess the death penalty, then you could do that?

"THE VENIREMAN: If I took the oath, yes, sir, I would have to answer honestly.

"THE COURT: The next question: would you take the oath?

"THE VENIREMAN: No, then I would have to put myself in a situation."

In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court wrote:

"The standard [for constitutionally permissible exclusion for cause] is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [quoting *Adams v. Texas*, supra]. We note that in addition to dispensing with Witherspoon's reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized ex-

perience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. For reasons that will be developed more fully infra, this is why deference must be paid to the trial judge who sees and hears the juror."

See also, *Lockhart v. McCree*, —— U.S. ——, 106 S.Ct. 1758, 90 L.Ed.2d 137, —— Cr.L. —— (May 5, 1986) ("It is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases *so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.*" [our emphasis].)

We find that the record supports the conclusion that the venireman's views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.":

"If the juror is to obey his oath and follow the law of Texas, he must be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias. The State does not violate the *Witherspoon* doctrine when it excludes prospective jurors who are unable or unwilling to address the penalty questions with this degree of impartiality." *Adams v. Texas*, supra.

The venireman in the instant case stated unequivocally that he would not take the

oath of a juror. He was unwilling to address the penalty questions *at all*. He was unwilling even to undertake the duties of a juror. His views would prevent the performance of his duties as a juror in accordance with his oath because he would not take the oath. See *Adams v. Texas*, supra; *Wainwright v. Witt*, supra; *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The venireman was unwilling to set aside his own beliefs in deference to the rule of law. See *Lockhart v. McCree*, supra. The trial court's exclusion of this venireman did not violate *Witherspoon* or *Adams*. The third ground of error is overruled.

In his second ground of error, appellant contends that the trial court excluded prospective juror Holstead in violation of *Witherspoon v. Illinois*, supra, and *Adams v. Texas*, supra. We set out the pertinent portions of the voir dire, as follows:

"A. First let me ask you this.

"Q. [Prosecutor] Okay.

"A. Say I'm selected.

"Q. All right.

"A. What happens if I refuse to take this oath? [3]

"Q. Well, nobody can make you take the oath. I'm not saying you would go to jail or anything like that.

"A. I don't know; I'm not a lawyer.

"Q. You're talking about the consequences of not taking the oath. The only consequences are if you take an oath and don't follow your oath; you see what I'm saying? Nobody can force you to take an oath that you cannot, in your mind, carry out ... Would you take the oath, an oath to render a true verdict, according to the law and the evidence, or would you refuse to take the oath because you would be asked to participate in a system that might result in the death penalty being assessed?

"A. I would refuse to take the oath.

"Q. [Defense counsel] earlier asked you nearly the same question. Are you

**3.** The oath of Art. 35.22, supra.

withdrawing the answer you had at that point?

"A. I'm getting confused. What I'm saying is: If I were to take an oath, then, under those conditions, I would feel a moral duty to perform under that oath.

"Q. But given the choice—

"A. But given the choice, I would not want to.

"Q. You would not want to or you would not do it, given the choice?

"A. I would not."

For the reasons discussed in the previous ground of error, the second ground of error is overruled.

■ In his fourth ground of error, appellant contends that the indictment is fundamentally defective because it fails to allege properly all of the elements of capital murder, Sec. 19.03(a)(2), supra. The indictment charges that appellant

"intentionally, while in the course of committing and attempting to commit Burglary of a Habitation owned by Bertie Elizabeth Eakins and located at 2210 18th Street, Apartment 19, Houston, Harris County, Texas, caused the death of Bertie Elizabeth Eakins by asphyxiating the Complainant in a manner and means unknown to the Grand Jury."

Appellant reads the indictment to allege that appellant intentionally caused the death of the victim while in the course of committing or attempting to commit burglary. Appellant goes on to point out that one of the elements of capital murder as defined in Sec. 19.03(a)(2) is that the actor intentionally commit the murder (as defined under Sec. 19.02(a)(1)) while in the course of committing an aggravating offense. Appellant contends that capital murder requires an intentional commission of murder, and murder in turn requires a culpable mental state. Thus, appellant concludes, the indictment is fundamentally defective in that it fails to allege a culpable mental state for the 19.02(a)(2) murder.

We find the contention to be without merit. Appellant would have the indictment read "intentionally knowingly and in-

tentionally caused the death." Capital murder under Sec. 19.03(a)(2) proscribes an intentional killing in the course of an aggravating offense. The indictment alleges an intentional killing in the course of an aggravating offense. Appellant's fourth ground of error is overruled.

■ In his sixth ground of error appellant contends that the trial court erred in refusing to give appellant's specially requested charge in the trial court's instructions to the jury at the punishment phase of the trial.

The record reflects the following exchange:

"[Defense counsel]: Your Honor, we would make a specific request of this Court that the second paragraph which reads as follows, 'If there is any Special Issue on which the vote of the jurors is unanimously qoute [sic] yes or no at least ten in favor of an answer of no, then there shall be no answer for that Special Issue and the foreman should not sign his name to any answer form for that Special Issue.' We would request at this time that paragraph be included in the charge as the Court has proposed.

"The Court: Well, that request will be denied."

Art. 37.071(c), (d) and (e), V.A.C.C.P. provides as follows:

"(c) The State must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.

"(d) The court shall charge the jury that:
(1) it may not answer any issue 'yes' unless it agrees unanimously; and
(2) it may not answer any issue 'no' unless 10 or more jurors agree.

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections

for life. The court, the attorney for the state, or the attorney for the defendant may not inform a juror or a prospective juror of the effect of failure of the jury to agree on an issue submitted under this article."

The trial court charged the jury as follows:

"The burden of proof in this phase of the trial still rests upon the State and never shifts to the defendant. Each Special Issue submitted must be proved by the State beyond a reasonable doubt; therefore, before any issue may be answered 'Yes,' all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be 'Yes.' If the jury unanimously determines (and only if such determination is unanimous) that the State has proved an issue beyond a reasonable doubt, then the Foreman will so record the Jury's answer to such issue by signing his name to the finding reflecting such answer on the form provided for that purpose.

"You are further instructed that if any juror, after considering the evidence and these instructions, has a reasonable doubt as to whether the answer to a Special Issue should be answered 'Yes,' then such juror should vote 'No' to that Special Issue in the jury's deliberations. "If ten (10) jurors or more vote 'no' to any special issue, then the answer of the jury shall be 'No' to that issue, and the foreman will so record the jury's answer by signing his name to the finding reflecting such answer on the form provided for that purpose."

We find that the trial court's instruction complied with the requirements of Article 37.071, supra. There was no error in denying the special requested charge. The sixth ground of error is overruled.

■ In his fifth ground of error, appellant complains of the following argument by the prosecutor at the punishment phase: "And he leaves San Antonio and he comes back to Houston. Within two weeks he is in Houston. January 12, 1983, I wrote it up on the board. And what is he doing—he is pulling a gun

again. He is breaking into an apartment or coming out of the apartment when Ollie spots him and Ollie says what are you doing. He pulls the gun, 'Hey, what are you doing m___ f___.' And points a gun at Ollie and he turns around and goes. He doesn't want to get shot and it's a good thing because he didn't know this man.

He didn't know what this man was capable, maybe this defendant didn't know what he was capable of and what does he do the same day, January 12, 1938 [sic] at the same apartments complex? Well, he is wiping out the Ashley Battles' family.

Ashley Battles and Maude Battles coming down from Michigan and bring everything with hopes of a new future, qualified for security work, have all the equipment having to get a job and go to a job interview and find out they have been wiped out and can't work at the jobs they have chosen. They have been wiped out.

"[Defense counsel]: Object to this line of argument. There is no testimony at all that Mr. Ellis was involved in the burglary of Mr. Battles, Ashley Battles' apartment.

"The Court: That's argument. Overruled. The jury has heard the testimony."

Appellant argues that the State had not proven that he committed the burglary of the Battles' apartment, and that the State was therefore precluded from inviting the jury to consider the burglary as one of appellant's prior unadjudicated offenses.

At the punishment phase, a witness testified that he lived at the Fondren Place Apartment on January 12, 1983. At one point in the morning hours, the witness heard loud knocks on the door of the Gatlins' apartment below his. When he went downstairs to investigate, he saw appellant "going in the window [of the apartment]. He was already proceeding in the window.... The window was up and the guy had one leg in the window and one leg out of the window." When the witness spoke to appellant to ask what he was doing,

appellant turned and looked at the witness. The witness testified that he saw a screwdriver in appellant's right hand, and a black revolver in his left. Appellant said to the witness, "Hey, you hold it, m—— f——." The witness turned and left to summon a security guard. When the guard and the witness returned to the scene, appellant had left. The owner of the apartment testified that when he returned to his apartment that day, he discovered that the bedroom window "was broken and looked like it was raised up or something." The owner testified that his wedding band, some watches, and two cameras were taken from his apartment that day, and that he had not given appellant permission to enter the apartment or take the property.

Ashley Battles testified that on January 12, 1983, he and his wife lived at the Fondren Place Apartments. They had come to Houston from Michigan seeking work as security guards and brought with them "All my security equipment, handcuffs, uniforms, night sticks and my gun belt, whatever." Battles testified that on that morning he and his wife "had an appointment for a job" and were gone from the apartment "a good couple of hours or more." When Battles returned to his apartment, he noticed that "We had been broke in to." Battles was asked if he was able to determine how the burglar had entered the apartment. He testified as follows:

"A. Through the kitchen window.

"Q. And how was that done?

"A. Well, some small implement. He tried to force my patio doors but I had a bolt in the bottom and that was jimmied with some kind of a tool. He couldn't gain entry there so he went to the kitchen window and below a little lock there and put something up and pop and—

"Q. Were you able to determine what kind of property was stolen?

"A. Yes. TV's, two sets of, night stick, two sets of cuffs, my wife's weapon, jewelry, some of my tools, suitcases and I had a policer [sic] camera from Detroit which didn't work

and she had a small 23 CB and that was also taken.

"Q. Pretty much wiped out?

"A. Yes."

Mrs. Eakin, the murder victim, had been found with her hands handcuffed behind her back. The handcuffs had been marked as State's Exhibit 60, and had been admitted into evidence at guilt-innocence. Battles testified concerning the handcuffs as follows:

"Q. Mr. Battles, I want to show you what has been marked as State's Exhibit 60, been admitted into evidence and ask if you can identify these. Have you ever seen these before?

"A. Yes. They are mine.

"Q. How can you tell those are your handcuffs?

"A. My Social Security number is on the back of them.

"Q. How long has that Social Security number been on the handcuffs?

"A. Ever since up in Detroit about maybe in '70, '65. Both pair were marked."

Appellant argues:

"This Court has held that the prosecutor may not ask the jury to consider prior offenses which have not been properly proven. *See, Brown v. State,* 530 S.W.2d 118, 119–120 (Tex.Cr.App.1975)."

*Brown* is altogether inapposite here. *Brown* was reversed because the prosecutor specifically asked the jury to punish the defendant for two additional crimes not then being tried.

In the instant case, the prosecutor's argument that appellant had burglarized the Battles' apartment was a reasonable deduction from the evidence. Ground of error number five is overruled.

The judgment of the trial court is affirmed.

ONION, P.J., not participating.

CLINTON, Judge, dissenting.

Appellant argues, in two grounds of error, that two prospective jurors were im-

properly excluded from the jury in violation of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (hereafter *Witherspoon*). The majority disposes of these contentions with a series of conclusory statements after setting out the respective voir dire examinations. It is instructive, however, to examine more closely the precise procedure the majority today approves for excluding prospective jurors. In appellant's case one juror was properly excluded. The other was not.

The first of these veniremen, Kenneth Holstead, told the trial court that he did not believe in the death penalty. He told the prosecutor on direct examination that he could never answer both punishment issues "yes" knowing the death penalty would be assessed as a result. "I don't think I could take an oath that would put me in that situation." [1]

On crossexamination the venireman was asked if he could put aside his feelings and vote on the special issues according to the instructions and the law he would be given by the trial court, to which he replied, "You [sic] asking about taking an oath as a juror, I would have to." On redirect examination, however, he reverted to his earlier position, with the qualification, "No, I couldn't *effectively* take the oath." [2] When he was once again questioned by defense counsel Holstead was asked, "And whether or not you feel you agree with that particular law, the fact is you could follow the law of what the Judge would give you in his Charge?" and answered, "Yes."

On the last round of questioning by the State, this crucial exchange took place, after the venireman was asked once more if he could take an oath to follow the law in arriving at his verdict:

"A: [By the venireman] First let me ask you this.

Q: [By the prosecutor] Okay.

A: Say I'm selected.

Q: All right.

A: What happens if I refuse to take this oath?

Q: Well, nobody can make you take the oath. I'm not saying you would go to jail or anything like that.

A: I don't know; I'm not a lawyer.

Q: You're talking about the consequences of not taking the oath. The only consequences are if you take an oath and don't follow your oath; you see what I'm saying? Nobody can force you to take an oath that you cannot, in your mind, carry out ...

Would you take the oath, an oath to render a true verdict, according to the law and the evidence, or would you refuse to take the oath because you would be asked to participate in a system that might result in the death penalty being assessed?

A: I would refuse to take the oath.

Q: Mr. Reyes earlier asked you nearly the same question. Are you withdrawing the answer you had at that point?

A: I'm getting confused. What I'm saying is: If I were to take an oath, then, under those conditions, I would feel a moral duty to perform under that oath.

Q: But given the choice—

A: But given the choice, I would not want to.

Q: You would not want to or you would not do it, given the choice?

A: I would not."

The State's challenge for cause was then granted without further questioning by either side.

"A man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State and can thus obey the oath he takes as a juror." *Witherspoon,*

---

**1.** The oath referred to throughout this opinion is found in Article 35.22, V.A.C.C.P.:

"When the jury has been selected, the following oath shall be administered to them by the court or under its direction: 'You and each of you do solemnly swear that in the case of the State of Texas against the defend-

ant, you will a true verdict render according to the law and the evidence, so help you God.'"

**2.** All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

391 U.S. 510, 88 S.Ct. at 1775, 20 L.Ed.2d 776. This potential juror, however, stated more than once that he could never answer both special issues affirmatively, knowing death would be assessed, no matter what the evidence showed. Because the jury's function in the punishment phase of a capital murder trial is to answer the special issues based on the law and evidence, clearly Holstead's performance of this duty would have been impaired by his scruples against capital punishment. This belief made him properly subject to a challenge for cause under *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589 (1980) [hereafter *Adams*]:

> "... a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

This standard was recently reaffirmed by the Supreme Court in *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 849 (1985).

However, Holstead also stated that he could follow the oath he would take as a juror, to render a true verdict based on the law and the evidence, not on the dictates of his own conscience. This equivocation in his answers seems to have arisen due to Holstead's apparent misapprehension that he would be violating the law if he said he could not take the oath. This belief left him in a dilemma: If he took the oath he would feel morally bound to follow it, but in doing so he would be violating his own belief that capital punishment is wrong. In casting about for a way out of this moral maze, Holstead asked what would happen if he did not take the oath, and discovered there would be no legal reprisal if he did not. He therefore managed to resolve his crisis of conscience by saying he would refuse to take the oath. In so doing he was in effect reasserting that he could not "effectively" take the oath; that he *could not* follow the law and the evidence in answering the special issues. It was clear Holstead would be "substantially impaired" in the performance of his duties as a juror.

He was properly excluded for cause. *Adams*, supra; *Witt*, supra; *Kelly v. State*, 669 S.W.2d 720, 728 (Tex.Cr.App.1984).

Now we come to the prospective juror Kenneth Bradshaw. His voir dire examination came days after that of venireman Holstead, but in some ways the earlier voir dire provided a framework for Bradshaw's questioning, as shall be demonstrated.

Initially the venireman told the trial court, "I couldn't say that a man should die for something; no." The voir dire examination then began. The prosecutor explained what capital murder is in Texas, distinguishing it from "ordinary" murder, and also explained the two questions the jury would be required to answer during the punishment phase of the trial. When asked if he would always answer one of those questions no in order to prevent the assessment of the death penalty, the venireman said, "I believe so." The prosecutor pressed him for a yes or no answer to the question, "Are you so against the death penalty that you would always answer one of these questions no in order to prevent the death sentence from being assessed?" "Yes," said the venireman. "In every case?" "Yes."

The prosecutor, showing a commendable desire to be certain of the juror's feelings, went on to explain that, "[I]f you are qualified for a jury, you have to take an oath to follow the law..." However, "the law will not require you to take that oath if you cannot live up to the oath."

> "The question I want to ask you is: Considering your feelings about the death sentence and given the choice of taking that oath or not taking the oath in a capital murder, would you refuse to take the oath?
>
> A: Yes."

The State thereupon challenged for cause and defense counsel was allowed to question the venireman for the first time. As so often happens, the venireman began to equivocate.

Defense counsel again explained the procedure during the punishment phase of a

capital murder trial. After the explanation Bradshaw was asked,

> "Q: If you were selected as a member of the jury, could you along with the other jurors after the State having proved to the members of the jury at the guilt or innocence phase of the trial could you thereafter be able to answer Special Issues 1 and 2 provided it is proven to you beyond a reasonable doubt?
> A: Yes. I could answer them.
> Q: And you understand that in order for the person to be given the death penalty the State does have the burden of proving both of these two special issues beyond a reasonable doubt...

> If the State proved to you as a member of the jury, beyond a reasonable doubt that these special issues should be answered yes, could you answer this yes?
> A: Yes."

A moment later, asked again if he could answer both special issues affirmatively, Bradshaw replied,

> "Can I say yes? I could answer yes to both of them but I don't think, you know, he should get—they should get punished but, you know, death."

At this point it began to appear that Bradshaw might be the type of juror *Adams* held cannot be properly excluded from a jury: those who have scruples against the death penalty but could nevertheless follow the law in answering the punishment issues. As *Adams* said, citing *Witherspoon*, "[I]f prospective jurors are barred from jury service because of their views about capital punishment on 'any broader basis' than inability to follow the law or abide by their oaths, the death sentence cannot be carried out." 448 U.S. at 48, 100 S.Ct. at 2528, 65 L.Ed.2d at 591. Bradshaw had stated that he *could* follow the law and abide by his oath. He remained adamant in that assertion when the trial court resumed questioning him:

> "THE COURT: Well we talked to you earlier about your qualifications and if you have some feelings about something, if you can set those feelings aside and be fair and impartial, then you are qualified as far as your qualifications as far as setting your feelings aside.

> What they are concerned about if you were on Question 2 and you knew if you answered Question Number 2 yes and you already answered Question Number 1 and if the State proved to you beyond a reasonable doubt that the answer to Number 2 should be yes and in your own mind you know that it should be yes— they proved it to you beyond a reasonable doubt that you should answer Question Number 2 yes, however heinous the crime is—would you vote yes knowing that I am going to assess the death penalty?

> THE VENIREMAN: *Yes, I would. I would tell the truth. Yeah. What I thought was right. Yes.*

> THE COURT: So then what you said earlier about having some scruples against the death penalty are not exactly what you led us to believe they are?

> THE VENIREMAN: Well, I'm not going to lie, you know. If both things are yes and that's the only choice I have and it's been proven I have to answer yes and be honest with the Court and what I know is right as far as the facts in my head, I have to answer yes.

> THE COURT: So then if you took the oath, *if you had a choice of taking that oath* to follow the law knowing full well what you have said to us about your feelings about the death penalty, are you telling me now that you would or would not?

> THE VENIREMAN: I would not take the oath.

> THE COURT: You would and could take the oath?

> THE VENIREMAN: I would not take the oath. Either I don't understand or you don't understand. What I am saying if I had to take the oath for some reason and I was in that situation and I saw the facts and it was true I would say yes. But—I would try to avoid taking the oath because I just can't see sentencing someone to death if the situation arose.

> THE COURT: Okay. The situation will arise if you are chosen as a juror in

this case. You will have to vote yes or no. There is no two ways about it. And you know if you take the oath that you will a true verdict [sic] according to the law and the evidence submitted to you, that you are going to have to answer those questions one way or another. And the question they are trying to determine is if it gets down to answering those questions and you have already taken the oath now, you see what I am saying? And you have got to answer those questions one way or another and you have got some feelings against the death penalty and at one point in time you said you don't believe in the death penalty.

THE VENIREMAN: *I don't but I have to tell the truth, too.*

THE COURT: What you are saying—

THE VENIREMAN: I'm going to follow it."

It was by this time quite clear that Bradshaw *was* precisely the type of venireman who could not be excluded for cause under *Adams*. He had stated firmly that in spite of his opposition to the death penalty he could answer both punishment issues in the affirmative if the evidence so dictated, *even knowing death would be assessed as a result*. The trial court continued questioning, however, after this clear assertion that Bradshaw would follow the law:

"THE COURT: No matter whether it does injury to your conscience and your soul or not?

THE VENIREMAN: If that's what I have to do because—

*THE COURT: You don't have to.*

THE VENIREMAN: I'm not going to lie.

THE COURT: But you don't have to. If your feelings are so strong—we are trying to find out how strong your feelings really are and we are not arguing about it.

THE VENIREMAN: I understand that.

THE COURT: We need to find out how strong your feelings really are. If your feelings are strong enough that if you take the oath and you are going to

follow your oath and it is not going to do damage to your own conscience and your own soul and if you are convinced beyond a reasonable doubt both of those questions should be yes knowing full well if you answer them yes that I am going to assess the death penalty, then you could do that?

THE VENIREMAN: If I took the oath, yes, sir, I would have to answer honestly.

THE COURT: The next question: would you take the oath?

THE VENIREMAN: No, then I would have to put myself in a situation.

THE COURT: Have you got any more questions?

MR. ADALPE: No, Your Honor.

MR. HAGSTETTE: Reurge the challenge, Your Honor.

THE COURT: The challenge for cause will be granted."

Thus exited this troublesome potential juror who stubbornly insisted that in spite of his opposition to the death penalty he could follow the law and the evidence and answer both special issues affirmatively if the State proved to him beyond a reasonable doubt that they should be so answered. He was excluded on the same ground Holstead had been, because he stated he would not take the oath. The crucial distinction between Bradshaw and the earlier venireman, however, is that he did not himself decide he would not take the oath; the idea was thrust on him. Even after he had been informed that "the law will not require you to take that oath if you cannot live up to that oath," he had said time and again that he *could* live up to the oath. It was only after suggestive remarks from the trial court ("... *if* you had a choice of taking that oath ..."; "You don't have to") that Bradshaw firmly stated he "would" not take the oath, because that would mean "I would have to put myself in a situation." The situation he would be in would be an uncomfortable one, no doubt—serving in a case which might result in a death penalty. That would certainly have made this venireman uneasy.

"But neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty. The grounds for excluding these jurors were consequently insufficient under the Sixth and Fourteenth Amendments."

*Adams*, 448 U.S. at 50, 100 S.Ct. at 2529, 65 L.Ed.2d at 592–593.

The State refers us to *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), in which the Supreme Court held that four potential jurors had been properly excluded after "Each of the four specifically stated twice that he or she would not 'take the oath.' " That sentence must be read in context. It came only after the trial court asked

"whether any of the prospective jurors were so opposed to capital punishment that 'they *could not* sit, listen to the evidence, listen to the law, [and] make their determination solely upon the evidence and the law without considering the fact that capital punishment' might be imposed. Four of the venire responded affirmatively. The trial judge then addressed the following question to those four veniremen:

'[D]o you feel that you could take an oath to well and truely [sic] try this case... and follow the law, or is your conviction so strong that you cannot take an oath, knowing that a possibility exists in regard to capital punishment?' "

*Lockett*, supra, 438 U.S. at 595–596, 98 S.Ct. at 2960, 57 L.Ed.2d at 984.

In *Lockett* the four veniremen "would" not take the oath because they "could" not follow it. Bradshaw in the instant case had clearly stated he could.

If trial courts and prosecutors are allowed to exclude potential jurors in this fashion there will be no need for elaborate questioning designed to discover whether a venireman's feelings about the death penalty would impair his performance. Instead anyone who evinces the slightest discomfort at serving in a death penalty case could be excused after a simple ritual such as this:

TRIAL COURT: Could you follow the law and the evidence in arriving at your verdict, in spite of your qualms about the death penalty?

VENIREMAN: Yes.

TRIAL COURT: But you don't have to.

VENIREMAN: Then I won't.

Of course anyone at all uncomfortable at the thought of answering questions knowing a death sentence could result would choose to escape such service. But by pointing out this escape hatch to such veniremen and then excluding them for cause the trial court will inevitably produce what *Witherspoon* condemned as "a jury uncommonly willing to condemn a man to die." *Adams*, 448 U.S. at 44, 100 S.Ct. at 2526, 65 L.Ed.2d at 588. In the words of *Adams*,

"... to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law."

*Adams*, 448 U.S. at 50, 100 S.Ct. at 2529, 65 L.Ed.2d at 593. Making clear to such jurors an easy way to exclude themselves produces the same effect. All those with qualms about the death penalty would opt out of jury service and the defendant would be left with a jury composed solely of those who were perfectly at ease with assessing a sentence of death. Such a jury could hardly be called impartial. It is instead "a tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521–522, 88 S.Ct. at 1776, 20 L.Ed.2d at 784.

The exclusion of venireman Bradshaw came after five weeks of voir dire examination in which more than a hundred veniremen had already been examined. I sympathize with the trial court's seizing on what appeared to be a formula, one magic question to decide whether the venireman was properly excluded for cause: "Would you

take the oath?" A death sentence may not be imposed where even one juror has been improperly excluded, however. *Davis v. Georgia*, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). This formula used by the trial court was *too* easy. The prosecutor and trial court, perhaps taking a cue from the earlier venireman, told this prospective juror from the beginning that he could escape this discomfiting duty by simply refusing to take the oath. That is not the law. The only reason for a juror to refuse to take the oath is if he *cannot* follow it. Bradshaw could. His exclusion from the jury was therefore improper.

A defendant in a capital case as in all others is entitled to an impartial jury. The method used to exclude Bradshaw in this case would produce instead a jury stripped of all those who might hesitate to impose a death sentence. We should not be willing to live with such a system, nor to let some die by it.

To the majority's unconstitutional disposal of appellant's third ground of error, I respectfully dissent.

TEAGUE and MILLER, JJ., join.

ONION, P.J., not participating.