Death Opinion






 







 



IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. AP-74,525






CHRISTOPHER CHAD BRITTON, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM HEMPHILL COUNTY






 Keller, P. J., delivered the opinion of the Court in which PRICE, WOMACK,
JOHNSON, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. MEYERS,
J., concurs in points of error 3, 4, and 5 and otherwise joins the opinion of the Court.


O P I N I O N




 Appellant was convicted in August 2002 of the capital murder of Deputy James Graham. (1) 
Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure
Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. (2) Direct appeal to this
Court is automatic under Art. 37.071, § 2(h). Appellant raises five points of error. We affirm.

 In his first point of error, appellant claims the trial court abused its discretion by granting the
State's challenge for cause against prospective juror Curtis Nazworth. Appellant argues that
Nazworth was qualified despite his opposition to the death penalty because he consistently stated
that he would follow his oath (3) and the law and would not consciously distort his answers.

 Careful review of the record is in order. When questioned initially by the prosecutor,
Nazworth reaffirmed the statement he made on his juror questionnaire that he was "opposed to
capital punishment under any circumstances." Before the bifurcated trial process and the special
issues were explained, Nazworth agreed with the prosecutor that his beliefs would make it hard, if
not impossible, to follow his oath. The prosecutor then explained the bifurcated trial process. 
Nazworth stated that his views about the death penalty would not cause him to compromise his oath
and place a higher burden on the State in proving guilt or innocence. The prosecutor then explained
the punishment issues. Nazworth stated that he would answer the future dangerousness issue
truthfully and stated further that his views about the death penalty would not hinder his ability to
carry out his oath. He also stated that he could answer the mitigation issue honestly.

 Nazworth continued to voice his opposition to the death penalty, stating that he "would prefer
to see a different form of punishment other than the death penalty," that he "would rather see life in
prison with no chance of parole," that he had "a difficult problem" with giving the death penalty, and
that he "had a problem with the administration of it." Nonetheless, Nazworth maintained that he
"would vote [his] conscience."

 The prosecutor then turned his attention to the oath and Nazworth indicated he might have
a problem taking the oath:

 Q. Let's talk a little bit about the oath. In this case you will be asked to take an oath
and it says you will render your verdict according to the law and the evidence given
to you. . . . Would you say that, because of your feelings about the death penalty, that
that would impair your ability to carry out that oath?


 A. I would have to ask you some questions first.


 Q. Go ahead.


 A. Okay. In this trial the death penalty will be sought?


 Q. Yes, sir. Probably.


 A. Okay. Yes, I would have a problem with doing that. I wouldn't if he was found
guilty, I wouldn't have a problem saying, "Sure, life in prison without parole." But,
death, yes, I would have a problem -


 Q. Taking that oath.


 A. Voting for that - sure.


 Q. Just so we know, state clearly, why would you have a problem taking the oath?


 A. Because I'm against the death penalty.


Defense counsel then questioned Nazworth, and Nazworth again stated that he would consider the
evidence and truthfully answer the special issues, but also again indicated some difficulty with taking
the oath.

 Q. You have already indicated to us that you could consider the evidence and if you
are persuaded beyond a reasonable doubt that the Defendant is a future danger, yes,
you will vote according to the evidence?


 A. Yes.


 Q. Even though you don't like it?


 A. Right.


 Q. Even though you know this takes you - this takes the case one step closer to a
possible death sentence, right?


 A. Yes.


 Q. You can do that?


 A. Yes.


 Q. That's what your oath calls upon you to do, right?


 A. Yes, I understand that.


 Q. And your oath, if you take the oath, may make you feel uncomfortable, may make
you feel lousy, may make you feel bad. But, do those things matter, really in the
ultimate summation, as far as carrying out your duties as a citizen?


 A. No, I still think I could - I could be true to the oath. As far as what my
convictions are - 


 Q. Yes?


 A. Let me make sure we're talking about the same thing. Are we talking about the
same thing [the prosecutor] was talking about? I would be very uncomfortable if the
oath included this - resulted in a death penalty. I probably would not be able to take
that oath with a clear conscious [sic].


Defense counsel then elicited more responses from Nazworth stating that if he took the oath, he
would consider the evidence and answer the issue truthfully. Nazworth reiterated that he would not
consciously distort his answer to the mitigation issue and stated that he would feel compelled to
uphold his oath even though it would make him uncomfortable. When passed back for questioning
by the prosecutor, the focus of the questions was once again on Nazworth's ability to take the oath:

 Q. Would taking the oath - would that substantially cause violence to your
conscience by taking that oath?


 A. It could well. I don't know how to answer that with an absolute yes or no. But,
yeah, I'm a thinking person and it would be very disturbing to me. As far as
substantial, by my estimation, probably so. . . . 


 Q. And why would it be substantial to you, or you think it probably would be?


 A. Because I would think that there would be - I would know that there would be
a chance that I would have to do something that, not something that would make me
uncomfortable, but something I might disagree with. To hand it over to, you know,
the next step. I don't know - I truly would have a problem with that. I think, you
know, like I say, [defense counsel] was saying, yes, I could - if given an oath I could
carry it out. But, as far as the substantial violence to one[']s own conscious [sic], I
would have a problem with that.


The prosecutor then told Nazworth that he could not be forced to take the oath, to which Nazworth
stated, "Thank goodness." And again, Nazworth responded affirmatively when asked if it would
"substantially violate [his] conscious [sic], if [he] had to take the oath." When questioned further
by defense counsel, Nazworth again stated that if given the oath he could carry it out, but that it
would do substantial violence to his conscience. The following exchange with the prosecutor then
took place:

 Q. Do you feel like your feelings about the death penalty would substantially impair
your ability to take that oath?


 A. Yes I do.


When passed back to defense counsel, Nazworth stated that he did not think he would take the oath
if chosen as a juror. Although he could follow the oath and fulfill his duty if he took it, he stated that
if not taking the oath was an option, he would not take it:

 Q. Well, if you are selected as a juror and you are brought in, will you take the oath? 
Will you take the oath?


 A. Is that a possibility?


 Q. Sir?


 A. Is that a possibility?


 Q. No, I'm asking you. Will you take the oath? We know it's going to make you
feel lousy.


 A. What happens if I don't take the oath.


 Q. You won't serve as a juror in this case, okay? I can't put it to you any clearer
than that.


 A. Okay.


 Q. We have talked about duty, we have talked about responsibility, we have talked
about doing things that maybe we don't want to do but we have got to do them. I
guess I just need to ask you, you walk back out of this Courtroom and you come back
in to find out how you stack up, if you are called forward to take the oath, will you
do it?


 A. I don't think so.


 Q. You won't do it?


 A. I don't think so. If I took the oath I would do it, I would fulfill my responsibility
for that. But, if taking the oath means that I have to do violence to my conscience,
or - I'm not just looking for an easy out here. But, if it means that if I [cannot] take
the oath, and not have to make that decision, then I would probably do that.


 Q. You would -


 A. I would probably -


 Q. - refuse to take the oath?


 A. I would probably not take the oath.


 Q. Probably?


 A. This [is] harder than I thought it was going to be. As truthfully as possible, no,
I wouldn't take the oath. If that is an option to me, then I won't take the oath.

 

Nazworth was challenged for cause by the State for his inability to take the oath and under
Wainwright v. Witt. (4) The State's challenge was granted.

 A prospective juror is challengeable for cause if his opposition to the death penalty would
prevent or substantially impair the performance of his duties as a juror in accordance with his
instructions and oath. (5) A prospective juror's beliefs or reservations about the death penalty will not
justify excluding him "so long as he maintains unswervingly that his reservations will not prevent
him from answering the special issues to the best of his ability in accordance with the evidence,
without conscious distortion or bias." (6) When prospective jurors have occasionally been led to
believe they have an option not to take the oath, and they state unequivocally they would not take
it, we have upheld the trial court's exclusion of those jurors on the grounds that they would be
impaired in the performance of their duties. In Ellis v. State, (7) the prospective juror stated that he
could follow his oath and be truthful if he were somehow forced to take the oath, but stated that, if
given the choice, he would not take the oath due to his feelings against the death penalty:

 Q. Considering your feelings about the death sentence and given the choice of taking
that oath or not taking the oath in a capital murder, would you refuse to take the oath?


 A. Yes.


 * * *


 THE COURT: So then if you took the oath, if you had a choice of taking that oath
to follow the law knowing full well what you have said to us about your feelings
about the death penalty, are you telling me now that you would or would not?


 THE PROSPECTIVE JUROR: I would not take the oath. . . . What I am saying if I
had to take the oath for some reason and I was in that situation and I saw the facts
and it was true I would say yes. But-I would try to avoid taking the oath because I
just can't see sentencing someone to death if the situation arose.


 * * *


 THE PROSPECTIVE JUROR: If I took the oath, yes, sir, I would have to answer
honestly.


 THE COURT: The next question: would you take the oath?


 THE PROSPECTIVE JUROR: No, then I would have to put myself in a situation. (8)


 Ellis argued that the prospective juror was wrongly excluded in violation of Witherspoon v. Illinois (9)
and Adams v. Texas. (10) The Court disagreed, holding that the prospective juror's unequivocal
statements that he would not take the oath supported a conclusion that his views "would prevent or
substantially impair the performance of his duties as a juror in accordance with his instructions and
his oath" under Wainwright. (11) In other words, "[h]is views would prevent the performance of his
duties as a juror in accordance with his oath because he would not take the oath." (12) 

 In accordance with our opinion in Ellis, if a prospective juror is told that taking the oath is
optional and he states that he would elect not to take it because of his feelings against the death
penalty, then he is rendered disqualified under the law. (13) Nazworth was such a prospective juror.

 Appellant argues that the State was required to establish that Nazworth's unwillingness or
preference not to take the oath was so strong that it would cause him to disregard evidence and
answer the special issues in such a way as to avoid imposition of the evidence. There need not be
evidence of both a refusal to take the oath and that the potential juror would consciously distort his
answers in order to justify the challenge. (14) Appellant also argues that Nazworth did not state he
would refuse to take the oath, but simply expressed a preference not to take it. Nazworth was led
to believe by both parties that he did not have to take the oath. He stated that he would not. The
record is sufficient to support the trial court's ruling under Ellis. Point of error one is overruled. 

 In his second point of error, appellant claims the trial court erred in sustaining the State's
challenge for cause against prospective juror Ruby Hale. Appellant claims the State did not develop
a sufficient record to justify its challenge to her based upon her stated dislike of lethal injection as
a means of execution, her understanding of "proof beyond a reasonable doubt," and her statements
that she could not consider probation in a murder case.

 The record was sufficient to support the trial court's granting of the State's challenge based
upon Hale's responses regarding whether she could consider probation. The following exchange
took place during the prosecutor's initial questioning of Hale:

 Q. Do you think you could ever consider probation for murder?

 A. No.

 Q. Pardon?

 A. Not if he killed someone.

 Q. Now, under the law, it's permissible for the jury to consider - 

 A. Uh-huh. (Yes).

 Q. - the jury doesn't have to give it. The jury can consider it if the person has never
been convicted before, if they think the sentence ought to be ten years or less, and if
they think the person deserves it. Do you think you could ever consider probation
under those circumstances for murder?


 A. No.


When passed for questioning by defense counsel, he did not further question Hale on that issue. 

 Hale stated unequivocally that she could never consider recommending probation for
someone found guilty of murder, which is a lesser included offense of capital murder. Appellant did
not attempt to rehabilitate her on the subject of probation. The State challenged Hale for cause in
part based upon her inability to consider probation in a murder case. A prospective juror is properly
challengeable for cause under Article 35.16(b)(3) if he cannot consider the full range of punishment,
including probation, for any offense of which the accused may be found guilty. (15) Murder is a lesser
included offense of capital murder. Because a jury may recommend probation in a murder case, Hale
was properly challengeable for cause when she stated she could never consider recommending
probation in a murder case. (16) 

 Appellant argues that Hale's inability to consider probation was due to the hypothetical
example of murder given by the State. The State's hypothetical was given when questioning Hale
about her ability to consider the full range of punishment in years. Although the questions about
probation came immediately thereafter, the probation questions were not clearly asked in the context
of the same hypothetical. Moreover, defense counsel chose not to further address the issue or clarify
the circumstances in which probation might otherwise be appropriate. Point of error two is
overruled.

 In point of error three, appellant complains that comments by the prosecutor during the
State's closing argument suggested that defense counsel conceded appellant's guilt. Appellant points
to the following emphasized portion of the State's closing argument at the guilt or innocence phase
of trial:

 [Prosecutor]: Now you remember - and it has been danced around and gotten close
to, but never really directly dealt with by the Defense as to their burden of proof. 
They have talked about a lot of things: about conspiracies and about alternative
explanations and hosts of behavior exhibited by [appellant]. But they haven't really
gotten to the core. They really haven't gotten to the issue. And that is their burden
of proof. It is now, I think, a given that [appellant] has committed capital murder.


 [Defense counsel]: Your Honor, I object as to any admission that I may have made. 
He is speaking outside the record. And I never made an admission that we [sic] were
guilty of the indicted offense.


 THE COURT: Sustained.


 [Defense counsel]: Would you please instruct the jury to disregard
that last comment, Your Honor?


 THE COURT: The jury is instructed to disregard the last comment.


 [Defense counsel]: I move for a mistrial.


 THE COURT: Denied.


 Appellant asserted the affirmative defense of insanity. Texas Penal Code § 8.01, Insanity,
provides:

 It is an affirmative defense to prosecution that, at the time of the conduct charged, the
actor, as a result of severe mental disease or defect, did not know that his conduct
was wrong.


By its plain language, the statutory affirmative defense of insanity involves a defendant who admits
his commission of the charged offense, but seeks to excuse his actions. (17) Defense counsel explained
as much in jury argument before the complained-of State's argument:

 When you are considering this issue as to whether this young man has a
mental disease or a severe mental defect, try not to think about the result. Take it up
to his finger on the trigger that day.


 * * *


 His conduct was the function of a mental disease and mental defect, and [it] is
obvious that he could not have known right from wrong when he takes the life of a
fine man he had known since he was three.


 * * *


 And the way I look at this case is this: There has to be an explanation for
[appellant's] behavior. Remember the first words out of my mouth on my opening
statements were "Tragic events don't happen in a vacuum." And I made it very clear
that we were never going to contest what happened on June 17th. And if you are
waiting for me to get up and make something out of that, then you will be here
waiting and waiting, and you will be unfulfilled.


The prosecutor's argument was both a reasonable deduction drawn from the evidence and a response
to defense counsel's argument. (18) The trial court did not err in overruling appellant's motion for a
mistrial. Point of error three is overruled. 

 In his fourth point of error, appellant complains that the prosecutor attempted to give his own
definition of insanity during his closing argument. His complaint arises out of the following portion
of the prosecutor's argument at the guilt or innocence phase of trial:

 [Prosecutor]: And I want to talk about some other lay witnesses first. And we do
have a host of those. And those are people who knew the Defendant. They grew up
with him. They were friends of his. They socialized with him. And he went to their
houses that morning, and every one of them said same old Chad. Nothing different
about him that day. T.C. Lovins saw him. He had worked for him. Nothing
different. Dean Anderson. This Defendant went over there and drank coffee with
him that morning. He wasn't talking about anything weird or wild. . . .


 Melissa Henson and Kathy Sirmans and Tiger Sirmans. He was standing there - the
Defendant was standing there chatting with Tiger. And what were they talking
about? Just stuff. And joking. And telling him, "You need to shave," and that type
thing. Nothing unusual until Officer Graham came up. . . .


 If you are delusional, you are delusional all the time. You can't be selective about
that: be okay one second and not okay the next second -


 [Defense counsel]: . . . I must object to the prosecutor's personal
opinion as to a definition of a symptom of insanity, when he states
that "When you are delusional, you are always delusional." That is
personal unsworn testimony, and it is not a proper deduction of the
evidence.


 THE COURT: Sustained.


 [Defense counsel]: Please instruct the jury to disregard . . .


 THE COURT: The jury will disregard.


 [Defense counsel]: I move for a mistrial.


 THE COURT: Mistrial is denied.


In most instances, an instruction to disregard improper jury argument will cure any error. (19) While
the prosecutor's statement was outside of the record, it was an isolated comment, was followed
quickly by the court's instruction to disregard, and was not the type of statement that was so flagrant
that it could not have been cured by the instruction. Consequently, the trial court did not err in
denying a mistrial. (20) Point of error four is overruled.

 In point of error five, appellant complains about the following portion of the prosecutor's
closing argument at punishment:

 But, let me tell you, it looked to me like the defense said, "Here it is, it's
against common sense, but it's about me." [Defense counsel], he talked more about
how he started in this case the day he - I think Gary Henderson the Ranger, that was
the principal investigator, and all of the officers got the call a little earlier. But,
[defense counsel] is really saying, "The mitigation in this case, it's about me." I want
to do something for the future [appellant]. And if you do that, what you are telling
them is, you can kill a police officer and you can get a life sentence.


 [Defense counsel]: Your honor, that is objectionable. That is
scurrilous, Your Honor. It is an attempt to read my mind and convey
an unspoken message totally outside the record. That is not what I
said to this jury.


 The Court: Sustained.


 [Defense counsel]: Would you please instruct the jury to disregard
those last two sentences by [the prosecutor], Your Honor?


 The Court: The jury is instructed to disregard those comments by [the
prosecutor].


 [Defense counsel]: Move for a mistrial.


 The Court: Mistrial is denied.


The meaning of the prosecutor's comments is not clear. But to the extent the prosecutor's comments
could be construed as attempting to convey defense counsel's thoughts and "convey an unspoken
message totally outside the record," they would have been improper. However, the comments were
isolated and their meaning unclear, and the court promptly sustained appellant's objection and
instructed the jury to disregard the comments. Any error was cured. (21) Therefore, the trial court did
not err in denying appellant's motion for mistrial. (22) Point of error five is overruled. 


 The judgment of the trial court is affirmed.



Delivered: December 8, 2004

Do not publish
1. Tex. Penal Code Ann. § 19.03(a). 
2. Art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles refer to the Texas
Code of Criminal Procedure.
3. Article 35.22 requires that the following oath be administered to the jury:


 You and each of you do solemnly swear that in the case of the State of Texas
against the defendant, you will a true verdict render according to the law and the
evidence so help you God.
4. 469 U.S. 412 (1985).
5. Id.; Riley v. State, 889 S.W.2d 290, 299 (Tex. Crim. App. 1994)(op. on reh'g), cert. denied,
515 U.S. 1137 (1995). 
6. Riley, 889 S.W.2d at 299. 
7. 726 S.W.2d 39, 42-44 (Tex. Crim. App. 1986), cert. denied, 480 U.S. 926 (1987). 
8. Id.
9. 391 U.S. 510 (1968). 
10. 448 U.S. 38 (1980).
11. 726 S.W.2d at 44. 
12. Id.
13. See id. 
14. Id. 
15. Narvaiz v. State, 840 S.W.2d 415, 427 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 975
(1993). 
16. Id. 
17. Cf. Giesberg v. State, 984 S.W.2d 245, 248-50 (Tex. Crim. App. 1998)(discussing theory
behind penal code defenses), cert. denied, 525 U.S. 1147 (1999). 
18. See McFarland v. State, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999). 
19. Wesbrook v. State, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000), cert. denied, 532 U.S.
944 (2001); Martinez v. State, 17 S.W.3d 677, 691 (Tex. Crim. App. 2000). 
20. See Hawkins v. State, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004).
21. Wesbrook, 29 S.W.3d at 115; Martinez, 17 S.W.3d at 691.
22. See Hawkins, supra.