Carl E. KELLY, Appellant,

v.

The STATE of Texas, Appellee.

No. 68874.

Court of Criminal Appeals of Texas, En Banc.

April 25, 1984.

Rehearing Denied May 23, 1984.

William Earl Stallings, Charles Warren McDonald, Waco, for appellant.

Lynn W. Malone, Sp. Prosecutor, Waco, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

This is an appeal from a conviction for capital murder. After finding appellant guilty the jury answered "yes" to the two special issues under Art. 37.071(b), V.A.C.C.P.[1] Punishment was assessed at death.

In his six grounds of error, appellant contends that the imposition of the death penalty in this case is prohibited by the United States Supreme Court's holding in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); there is insufficient evidence to sustain appellant's conviction under the law of parties as proscribed by V.T.C.A.Penal Code, Sec. 7.02(a)(2); the trial court erred in admitting evidence obtained as a result of an illegal search; the trial court erred in failing to instruct the jury to disregard the illegally obtained evidence if they had a reasonable doubt as to the validity of the search; the trial court erred in the improper exclusion of a prospective juror; and finally, the trial court's failure to include written findings of fact and conclusions of law concerning the voluntariness of appellant's confession as required under Art. 38.22, Sec. 6, V.A.C.C.P., constitutes error.

We find appellant's contentions to be without merit and accordingly affirm his conviction.

In his second ground of error appellant contends there is insufficient evidence to sustain his conviction under V.T.C.A.Penal Code, Sec. 7.02(a)(2), by its failure to preclude every reasonable hypothesis other than that appellant intended to kill the victim named in the indictment. The evidence reveals that on September 2, 1980, the victims, Steven Pryor and David Wade Riley, a transient found asleep in Pryor's 1980 brown Camaro automobile, were kidnapped from the convenience store where Pryor was employed at approximately 4:15 a.m. and taken to Cameron Park where they were both murdered. Diana Player, an acquaintance of Pryor's and a regular customer at the store, testified she saw "three black males" escort the victim to his car outside the store and watched the victim drive toward Cameron Park. Player was soon joined at the unattended convenience store by Ed Torres, an off-duty policeman, who telephoned police to report the missing attendant. Shortly thereafter and before police arrived, Dewey Verona, a regular customer of Pryor's, arrived at the site and, at trial, testified he saw a man get out of the victim's car which had pulled up across the street from the store, dropped the man off and then departed. Verona

---

1. Art. 37.071(b) V.A.C.C.P., in pertinent part, provides:

"On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society...."

testified he followed the man's path with his eyes and only "lost contact with him for a few minutes" until the same man approached the group and asked for assistance in starting his stalled automobile parked near the store. The three witnesses and two police officers called to the scene testified that the man who requested assistance (later identified as the appellant) appeared to have blood on his shirt, his arm and his two-toned shoes. When police officers questioned the appellant about the blood, he replied that he had gotten into a fight earlier that evening. Upon asking for identification, appellant replied that he had none. Police officers characterized appellant as "belligerent" and testified appellant was found in the store, which had been sealed off to the public, twice after previously being asked to leave. While in the store, appellant asked the investigator dusting for fingerprints whether he had found any and quickly told the officer that he had been in the store earlier "buying a slurpee" and wished to purchase another. After working on his stalled vehicle, appellant subsequently left the convenience store area.

An All-Points-Bulletin was issued for the victim's 1980 Camaro which was later stopped at approximately 6 a.m. by police officers outside Hillsboro. The driver, Thomas Graves, was arrested and a search of the car followed. Items retrieved in the trunk of the car included the appellant's billfold; two revolvers; a green canvas sack which contained money; a backpack which contained clothes and prescription bottles in the name of David Wade Riley;

and blood-stained towels. Blood stains were found on the door and floormat of the automobile. Limestone dust found on the floorboard of the car was the clue that led police officers to Cameron Park where the bodies were found at the bottom of a cliff in the park area. Upon discovering the appellant's billfold in the trunk of the victim's car, an arrest warrant was issued. At approximately 10:00 a.m. appellant was arrested at his place of employment.

■ Dr. Robert Walter, a pathologist who performed an autopsy on Pryor, testified that although the victim died from multiple gunshot wounds to the back of the head fired at close range, Pryor also sustained numerous serious fractures as the result of being thrown from the cliff. Patricia Lux, a Department of Public Safety blood analysis expert, testified that the blood stains found on the appellant's two-toned shoes matched the blood type of the victim, Steven Pryor. Ronald Richardson, a DPS firearms examiner, testified he was unable to determine if the bullets recovered from Pryor's body were fired from the same gun because of the mutilated and deformed condition of one of the bullets. In a written statement appellant confessed to participation in the robbery, kidnapping and murder of the store clerk and the transient, David Wade Riley. In an earlier portion of the statement, appellant indicated that his accomplice, Graves, had shot both victims, but later admitted in the statement that he shot the second victim, Riley, and helped throw both bodies over the cliff.[2]

2. Appellant's written statement, in pertinent part, reads:
"I don't know what time it was man, last night, about the pills—I'm the one that took the pills—when he, Thomas Graves, I know him by Ollie.
"I was out, he was driving my auntie's car. When I woke up he had money bags and everything in the car. It was out there toward Temple like. Then he told me he had made some money and he told me he had just shot some peoples. [sic] Three peoples or something.
"Then we rode out there like Lake Air at H.E.B. We stopped in H.E.B. and was going to rob it, but I told him no.

"After we left H.E.B., this is when we went out on Park Lake. We went inside the 7-11. I bought a slurpee, then pulled a gun. Then he said, 'Let's take them with us'. I got into the car, there was a guy laying in the back seat asleep. Then we went straight to Cameron Park.
"Then Island told them to get out of the car, then told both of them to lay face down on the ground.
"Then he shot the 7-11 dude. I remember it was about three or four times. When I shot at the other one, he tried to run. He stopped when I shot. Then Island shot him, I didn't shoot him. The one that was laying in the car

Appellant's contention that there is insufficient evidence to sustain his conviction under V.T.C.A. Penal Code, Sec. 7.02(a)(2),[3] by its failure to preclude every reasonable hypothesis other than that the appellant intended to kill the victim named in the indictment is without merit. The case was submitted to the jury with an instruction on the law of parties and an instruction on circumstantial evidence.[4] The standard of review for convictions based on circumstantial evidence is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (State's Motion for Rehearing). In circumstantial evidence cases the analytical guidelines for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt are those that we have historically employed, to wit: the outstanding reasonable hypothesis analysis. *Id.* at 449. "Stated in the converse, if the evidence supports an inference other than the guilt of the appellant, a finding of guilt beyond a reasonable doubt is not a rational finding." *Id.* at 449.

■ Since an instruction on the law of parties was submitted to the jury, we must look to whether the evidence could have reasonably been interpreted to show appellant's participation in the offense in such a manner so as to render him guilty as a party to Thomas Graves' actions. In *Porter v. State*, 634 S.W.2d 846 (Tex.Cr.App. 1982), we said:

"A defendant is guilty as a party to an offense when he is physically present at the commission of the offense and encourages the commission of the offense either by words or other agreement....
In determining whether one participated as a party in committing an offense, the fact finder may look to events occurring before, during and after the offense and reliance may be placed on actions which show an understanding and common design to do a certain act...." *Porter*, supra at 849.

In *Baldridge v. State*, 543 S.W.2d 639, 643 (Tex.Cr.App.1976), this Court held that while knowledge of intent to kill is a necessary element to hold the defendant as a principal in the offense of murder with malice, "this knowledge may be inferred from the *circumstances surrounding the*

---

asleep we threw him over cliff first.[sic] I helped him.
"After I helped him throw the body over we got in the car. We drove out of Cameron Park, back to the seven-eleven about a block and a half from the seven-eleven. Then I walked back to the store. I went to my car. Then the police asked me if I saw anybody in the store. I told they [sic] yea [sic] when I first came in and bought the slurpee. He asked me if the 7–11 dude was in there and I said yea [sic], when I bought the slurpee.
"I told him my car had stopped. I got in my car and left.
"He had the money in a paper bag and the guns in a satchell. Island had them. The gun I had, I left in the car with Island.
"When the 7–11 guy was laying on the ground he said 'please don't shoot me.' He gave me about forty dollars that's the money that come from the other place where he said he shot the peoples.
"Alright, I didn't miss him, the one that was laying in the back seat, I hit him, I don't know where I hit him. When I hit him he fell. After that I picked him up and threw him over the cliff, that's why I had all the blood on my shoes.

"I wasn't telling the truth about missing him. After I got out of the Camaro I went to the 7–11 to get my car and we were suppose to meet in Parkside.
"But when I got down there to Parkside he wasn't there. The police was talking to me at the 7–11, that what made me miss him.
"We were suppose to meet down there and split the money. I just went looking for him man."

3. V.T.C.A. Penal Code, Sec. 7.02(a)(2), entitled Criminal Responsibility for Conduct of Another, provides:
"A person is criminally responsible for an offense committed by the conduct of another if: ...
(2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or...."

4. This Court has held that a charge on circumstantial evidence is no longer necessary. See *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App. 1981) (Opinion on State's Motion for Rehearing).

*killing."* (Emphasis in original). In looking to events which occurred before, during and after the commission of the offense, the evidence reflects that the appellant knew that Graves had participated earlier in an aggravated robbery of an H.E.B. store and had "shot some peoples",[5] the appellant acted together with Graves in committing the aggravated robbery in the instant case in that the appellant entered the convenience store armed with a revolver which he pulled on the victim; the appellant actively assisted in escorting the victim from the store to his automobile; he actively participated in the shooting spree in which both victims were killed; he actively participated and assisted in throwing the victims' bodies over a cliff; and he anticipated a later meeting with his accomplice at which time they would split the money obtained from the robbery.

We find there is sufficient evidence in the record to reflect that the appellant acted with the intent to assist Graves in the commission of the robbery and murder inasmuch as he encouraged, aided and actively participated in the murder of Steven Pryor. We conclude that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt and the evidence reflects that there is no reasonable hypothesis other than that the appellant is guilty of causing the death of the victim, Steven Pryor. Appellant's ground of error is overruled.

In ground of error number one, appellant contends that the imposition of the death penalty in this case is prohibited by the Eighth Amendment's ban against cruel and unusual punishment as interpreted by the U.S. Supreme Court in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). Appellant faults the trial court for failing to require in its charge that the jury specifically determine from the evidence beyond a reasonable doubt that appellant had the intent to kill the victim named in the indictment, Steven Pryor. Appellant argues that the *Enmund* decision mandates a finding that the appellant specifically intended to and did *personally* kill *the victim named in the indictment,* regardless of the appellant's actions which evidence that the appellant "intended a killing take place or that lethal force will be employed." *Enmund,* supra at 797, 102 S.Ct. at 3376. Not only did appellant fail to request such a jury charge, as required by this Court in *Jaycon v. State,* 651 S.W.2d 803, 807 (Tex.Cr.App. 1983),[6] but he has also misinterpreted *Enmund* (wherein the judgment upholding the death penalty of the nontriggerman defendant who was waiting outside the victim's home and who, it appears, was unaware of the plan to rob and murder the victims, was reversed "in the absence of proof that Enmund killed or attempted to kill, and regardless of whether Enmund intended or contemplated that life would be taken." *Enmund,* supra at 801, 102 S.Ct. at 3379).

■ *Enmund* does not limit itself merely to a requirement that the appellant have the specific intent to kill the victim named in the indictment. Rather, imposition of the death penalty is additionally not prohibited where the appellant anticipates and contemplates that life will be taken or that lethal force will be employed.

■ The evidence as detailed earlier amply supports a finding that the appellant "intended a killing take place or that lethal force will be employed," *Enmund,* supra at 797, 102 S.Ct. at 3376, against Steven Pryor, as well as supporting a finding that appellant solicited, encouraged and directed his accomplice, Thomas Graves, to kill the

---

5. See appellant's confession, fn. 2, supra.

6. In *Jaycon,* supra at 807, quoting *Romo v. State,* 568 S.W.2d 298 (Tex.Cr.App.1978) (Opinion on State's Motion for Rehearing), this Court held,

 " 'In circumstances where a defendant, if guilty at all, is guilty as a party, then the court should properly apply the law of parties to the facts of the case, but the failure to do so is not reversible error unless there is a timely and sufficient objection.' "
 See also *Garrett v. State,* 642 S.W.2d 779, 781 (Tex.Cr.App.1982); *Wallace v. State,* 618 S.W.2d 67, 69 (Tex.Cr.App.1981).

victim, Steven Pryor, and also aided and attempted to aid his accomplice in killing Pryor, and that he did all of this with the *intent* to promote and assist the killing of Pryor.[7] In addition, a review of the record reveals that appellant's objections to the court's charge at trial do not comport with the objection now raised on appeal, and thus, there is nothing presented for review. *Fancher v. State*, 659 S.W.2d 836, 839 (Tex.Cr.App.1983). Appellant's ground of error is overruled.

 In his third ground of error, appellant contends that the trial court committed reversible error by the admission into evidence of appellant's two-toned shoes which he contends were seized in violation of appellant's Fourth Amendment rights. It is well established that a search conducted without a warrant issued on probable cause is *per se* unreasonable and that the warrant requirement is subject only to a few well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1976). One of the specifically established exceptions to the requirements of both a warrant and probable cause occurs in a search that is conducted pursuant to consent from a person in control of the premises to be searched. *Martin v. State*, 610 S.W.2d 491, 492 (Tex.Cr.App.1980). Before consent can be effective, however, the prosecution must prove by clear and convincing evidence that the consent was given freely and voluntarily. *Bumper v. South Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Whether consent to search was voluntary is a question of fact to be determined from the totality of the circumstances. *Fancher*, supra at 839. In order to determine the voluntariness of the search, a brief review of the facts of the search are necessary.

Former Waco Police detective Joe Lopez testified that on the afternoon of appellant's arrest, he went to appellant's mother's house where the appellant was residing. Lopez testified that appellant's mother, Rosalie Kelly, consented to the plain-clothed police officer's entrance to her home for the purpose of obtaining the shoes appellant had worn during the murders. Lopez testified that Mrs. Kelly then voluntarily left the room and returned shortly with appellant's shoes, which she had apparently removed from appellant's room, and told the police officer that "these were the shoes that he [appellant] was wearing." Rosalie Kelly testified, however, that the police officer entered her home uninvited and requested appellant's shoes and the items of clothing appellant was wearing on the morning of the murders. Mrs. Kelly testified she never gave the police officer permission to enter her home but that "he just followed me to get

---

7. The trial court charged the jury under the law of parties as follows:

"All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another person for which he is criminally responsible, or by both.

"A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

"Each party to an offense may be charged with commission of the offense committed, if any."

In order to convict appellant then, the jury had to find that he solicited, encouraged, or directed another to kill Pryor, or that he aided or attempted to aid another in the killing of Pryor AND that he did so with the specific *intent* to promote or assist in the killing of Pryor.

The definition of "intent" and "knowledge" as set forth in V.T.C.A. Penal Code, Sec. 6.03(a) & (b), was included in the jury charge as follows:

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

"A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."

the shoes." The appellant's mother testified that the mere presence of police officers "scared" her.

■ The validity of Mrs. Kelly's consent is a question of fact to be determined from the totality of the circumstances. *Paulus v. State*, 633 S.W.2d 827, 851 (Tex.Cr.App. 1982) (Opinion on State's Motion for Rehearing). The trial judge was the trier of the facts and the judge of the credibility of the witnesses and the weight to be given their testimony at the hearing on the motion to suppress evidence. *Id.* The State's evidence supports the trial judge's conclusion that the consent was freely and voluntarily given. The court was entitled to reject all or any part of Mrs. Kelly's testimony concerning the conduct of Officer Lopez. The trial court did not err in overruling the motion to suppress or in admitting the appellant's shoes into evidence. Appellant's third ground of error is overruled.

■ In his fourth ground of error, appellant contends that the trial court committed reversible error in failing to instruct the jury to disregard the illegally obtained evidence in accordance with Art. 38.23, V.A.C. C.P.[8] Appellant asks this court to hold that the failure to include an Art. 38.23 instruction, despite the fact that *no such request was made*, constitutes fundamental error and mandates reversal. This we decline to do. Appellant's reliance on *Jordan v. State*, 562 S.W.2d 472, 473 (Tex.Cr. App.1978), is misplaced. In *Jordan* we held that where the appellant objects to the court's charge, specifically pointing out his complaint concerning the lack of an Art. 38.23, V.A.C.C.P., instruction and timely presents to the court a requested charge on the issue and where an issue concerning the validity of the search is raised by the evidence, the defendant has a statutory right to have the jury so charged. *Id.* See also, *Murphy v. State*, 640 S.W.2d 297, 299 (Tex.Cr.App.1982); *Welcome v. State*, 635 S.W.2d 828, 833 (Tex.App.—Beaumont 1982); *Morr v. State*, 631 S.W.2d 517, 518 (Tex.Cr.App.1982). There was no such objection in this case. Appellant's ground of error is overruled.

■ In ground of error number five, appellant contends that the trial court erred by granting the State's motion to strike venireman Aaron Foster because Foster did not state unambiguously that he would automatically vote against the imposition of the death penalty despite the evidence at trial. Appellant contends that Foster was excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), and asserts that the venireman "merely voiced his general objections to the imposition of the death penalty" and failed to "state that he would ignore the law or violate the oath." In the colloquy which ensued between Foster and both counsel for the State and appellant[9] the venireman stated unequivocally that he would not answer "yes" to the special issues under circumstances if it meant that such answers would require the imposition of the death

8. Art. 38.23, V.A.C.C.P., provides:
 "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
 "In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained."

9. Pertinent portions of the 49 pages of transcript concerning the voir dire examination of Venireman Foster include:

"Q. Okay. Well, first off, could you answer the questions?
"A. No. I couldn't answer the questions.
"Q. Okay. Even if the judge told you to look at the evidence and answer the questions, could you answer the questions?
"A. No. I would just tell him I couldn't.
"Q. Okay.
"A. And I can't.
Later the following occurred:
"Q. But when you become a juror, that's what you would have to do, and the Judge would instruct you that's what you have to do. Now, is your feeling so strong that you just have to say, I'm sorry, Judge, I can't answer those questions?
"A. Yeah. That's it.
"Q. Okay. You would have to—

Note 9—Continued

"A. I wouldn't. He couldn't instruct me to answer something I don't believe in could he?

"Q. Okay. Well, that's what we need to find out. Is that the way you feel?

"A. Yeah. I feel like I told you. I don't want to take nobody's life."

After the State challenged the venireman for cause, counsel for the appellant was permitted to interrogate Foster. During the examination the following exchange took place:

"Q. What I'm asking you sir is this: If the Court instructed you to follow the law and gave you instructions on punishment—

"A. Well, I would follow the law.

"Q. All right, sir.

"A. But if I don't believe in capital punishment, I would say, 'No'.

"Q. All right. Well, you wouldn't necessarily have to believe in it?

"A. Regardless of what the Judge asked me. Anything I don't believe in, I am not going to do it."

Appellant contends that the following exchange between the State and the venireman reflects that Foster merely voiced a general objection to the death penalty.

"Q. Now, what the Judge was asking, were your feelings so strong that you would have to answer "No" to a question, just to make sure the person doesn't get death?

"A. If I knowed the right question, I would say "No".

"Q. Okay. Even if the evidence said you ought to answer "Yes" to both questions, would you still have to answer—?

"A. Then I wouldn't know."

[objection was made by defense counsel and overruled by the Court]

"Q. If the evidence said you were supposed to answer "Yes" to both questions, would you still have to answer one of them "No"?

"A. I wouldn't now. Because I don't know which one of them questions that you got down there means the death penalty or life imprisonment. I don't know that.

"Q. Okay. Based upon the answers to both of the questions, you see—both of the questions?

"A. I understand what you're saying.

"Q. Okay. If you answer both of them, "Yes"—

"A. I told you that I would answer them "No", I wouldn't know. Now, that still an answer that I don't know.

"Q. Okay. Are you saying that there is no way you can—?

[objection was interposed by the defense]

"A. I don't believe in it.

[Defendant's objection overruled]

"A. If I can't understand nothing, I'm not going to answer that, and I don't understand that. You said either one. Of course, I don't know which one would give him the electric chair, or what. See, I don't know which one would do.

"Q. Either one. Either one. If you answered either—?

"A. Well, then I would say "No". I'm stilling [sic] saying that now. I would say "no", because if I don't know which one would give life imprisonment I might would say, yeah. But I ain't never going to say yeah on the one that will kill him. I'm not ever going to say that. If you will tell me which one of them is going to, that I would be answering, then maybe we could get somewhere. But, see, you're just going to tell me some answers . . . ."

The State then explained the implication of answering the questions "Yes" and the following conversation took place:

"Q. Well, if they do have the same answer, both of them have "Yes" answer, death penalty.

"A. I would say "No".

"Q. You would have to say "No" to one of them?

"A. To both of them, if they both meant the same thing.

"Q. Okay. In other words, you would have to say "No" regardless of what the Judge told you to do?

"A. Yeah. I would say "No", because I don't believe in killing nobody. I don't believe in that.

"Q. Okay. You would have to say "No", regardless of what evidence shows?

"A. Yeah. If it meant for him to be killed, I would say "No"."

Upon reexamination by appellant's counsel:

"Q. Aaron, right now, you really don't know what you would do, because you haven't heard any evidence, right? But you could consider the flip side of the coin?

"A. I'm not going to change what I said.

"Q. You could consider the flip side of the coin, and just based on the evidence answer the questions, right?

"A. No. I don't go for capital punishment, now. I done told you that.

"A. There would be no flip side of the coin."

Thereafter, the court proceeded to interrogate Foster, and the following exchange took place:

"The Court: You have got to listen to evidence and determine that, just like you would determine whether or not somebody ran a red light, or whatever. That's what a jury does, is determine what a fact is. And that is a question you would be asked. Okay. So, let's forget about that for minute. Then you would be asked, is it probable that he is going to commit acts of violence in the future? Okay? And you would hear some evidence on that. Now, if you answered that question "Yes", it is going to be my job to say the death penalty is the punishment. If you answer that question "No", no matter what kind of evidence you heard, and no matter what you really think is right, so he won't get the death penalty?

penalty. Foster reiterated throughout the conversation with both counsel for the State and appellant his strong opposition to the death penalty and repeatedly stated that he would disregard the evidence and answer the special issues in such a way as to avoid the imposition of the death penalty. We find that Foster's repeated and unequivocal denunciation of the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath." *Adams,* supra at 45, 100 S.Ct. at 2526. We find that Foster was properly excused for cause in accordance with *Witherspoon,* supra, and *Adams,* supra, and thus, appellant's fifth ground of error is accordingly overruled. See also, *Meanes v. State,* 668 S.W.2d 366 (No. 68,901, delivered September 14, 1983).

In his final ground of error, appellant asserts that the trial court erred in failing to include in the record written findings of fact and conclusions of law as required by Art. 38.22, Sec. 6, V.A.C.C.P. As the State has aptly pointed out in its brief, such written findings of fact and conclusions of law concerning the voluntariness and admissibility of appellant's written confession appear in the record at page 200 entitled "Order Overruling Motion to Suppress Confession." Appellant's ground of error is overruled.

Finding no reversible error, we affirm the judgment of the trial court.

"A. I don't want him dead. I say, no, don't kill him.
"Q. No matter what the evidence is?

"A. No matter what the evidence is, you can put him away without killing him.
"The Court: I sustain the challenge."