

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00091-CR

XAIVER JAMALL BOOKER, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 29610

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

As a result of an eight-day crime spree, Xaiver Jamall Booker was convicted by a Lamar County jury of four counts of aggravated robbery,[1] one count of murder,[2] and one count of aggravated assault.[3] Based on the jury's determination that Booker was previously convicted of a felony and its assessed punishment, the trial court sentenced Booker to ninety-nine years' imprisonment on each count, with the sentences to run concurrently.

On appeal, Booker asserts that the trial court reversibly erred when it (1) failed to include accomplice-witness instructions regarding two of the State's witnesses in its jury charge, (2) failed to include a jailhouse-witness instruction regarding another witness in its jury charge, and (3) failed to instruct the jury that it must find that he had specific intent to engage in murder or aggravated assault; Booker also contends that (4) accumulation of error undermined his right to due process and tainted the verdicts in the remaining counts. We will affirm the trial court's judgment.

## I. Background

### A. The Bailey Robbery

Booker was convicted of six felony offenses that were alleged in a single indictment. The first count alleged that Booker committed the aggravated robbery of Travon Bailey and that Booker used or exhibited a firearm (the Bailey Robbery). Regarding this robbery, Bailey

---

[1]*See* TEX. PENAL CODE ANN. § 29.03(a)(2).

[2]*See* TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (Supp.).

[3]*See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Supp.).

2

testified that, on the afternoon of September 20, 2021, he walked up to a parked car in Paris and asked Booker for a lighter. While he was lighting his cigarette, Booker took Bailey's firearm, which was tucked in his waistband, and pointed it at him. Bailey said that the firearm was a "Glock 9 483 (sic) camo" and that there was a round in the chamber. He testified that Booker was in the driver's seat of the car and that another person in the car, whom he knew as "Red,"[4] also pointed a firearm at Bailey. Bailey said that he saw his life flash before him. Booker and Red also took a bag from him that contained his wallet, iPhones, and a small amount of cash. Booker told Bailey to leave and threatened to shoot him if he turned around or did anything crazy. Bailey identified State's exhibit 23 as the Glock pistol stolen from him. At trial, Brown testified that he did not know anything about the Bailey Robbery and denied any involvement.

### B.      The Morrison/Jackson Robbery

The second and third counts in the indictment alleged that Booker committed the aggravated robbery of Landry Morrison and Zykius Jackson, respectively, and that Booker used or exhibited a firearm (the Morrison/Jackson Robbery). Morrison testified that, on the afternoon of September 21, 2021, he was at Finess McCuin's house with Jackson and that he (Morrison) had left his AR-15 in his car. About thirty minutes after he arrived, Brown opened the front door of the house, pointed a gun at them, and demanded Morrison's car keys. Brown took the keys off a table and went back outside. When Morrison went to his car, the AR-15 and a pair of sunglasses were missing. Morrison found his keys in the yard. After that happened, he assumed McCuin was a part of the robbery because McCuin had been on his phone the whole time, ran

---

[4]"Red" is the nickname of Davarrious Brown.

into another room when Brown came through the door, and left the house through a window. Jackson's testimony was consistent with Morrison's.

McCuin refused to testify at trial, but the State played for the jury, without objection, a recording of his interview with law enforcement. In his interview, McCuin said that, when Morrison and Jackson came over, he saw the AR-15 in Morrison's car, so he sent a text message to everybody and asked that someone come and take the rifle from the car. Booker[5] was the first to answer, and McCuin began exchanging text messages with him. Eventually, Booker messaged McCuin and said the car door was locked, and McCuin suggested they break the window. When that failed, McCuin asked Booker if anyone had a "stick" or gun. Booker responded and said that Brown was with him and that he had one. McCuin then messaged Brown and said they should come in the house and act like they were robbing them. A short while later, "Red" opened the door, engaged a bullet, pointed the gun at Morrison and Jackson, and demanded the keys to the car. McCuin then left through a bedroom window, took the AR-15 from Morrison's car, and got in a car with Brown and Booker's girlfriend, who was driving.

A recording of Booker's interview with law enforcement was also shown to the jury, without objection. In that interview, Booker did not deny that he and Brown were in the car at the Morrison/Jackson Robbery, and he identified his girlfriend as the driver of the car. He also confirmed that he was exchanging text messages with McCuin and confirmed the events that took place at McCuin's house, consistent with McCuin's statement. However, Booker claimed that he had a change of heart when he got to McCuin's house.

---

[5]Booker goes by the nickname "Big Daddy."

4

Brown testified that he did not know anything about the Morrison/Jackson Robbery and denied any involvement.

Tom Morris testified that he had been in custody with Booker in the Lamar County Jail and that, while in jail, he was a "writ writer" who helped other inmates understand the law and filed motions in their cases. Booker reached out to Morris for help with his case. At one point, Morris received a handwritten document from Booker, which was introduced into evidence. The document apparently concerned the Morrison/Jackson Robbery and, as read to the jury, stated, "It was me and my girl was a getaway driver on this robbery charge so why she not charged by law everybody supposed to get charged."

### C.    The Wallace Robbery

The fourth count in the indictment alleged that Booker committed the aggravated robbery of Jquarius Wallace and that Booker used or exhibited a firearm (the Wallace Robbery). Wallace testified that, on the evening of September 28, 2021, he pulled up in a car on Provine in Paris with Kevin Thomas and Keith Mann,[6] and that Booker, Brown, and Jatarious Council[7] drew guns on them. Council was at the right front of the car, Brown was at the left rear, and Booker was at the driver's door. Booker and Brown pointed their guns at Wallace and told him to get out of the car. He exited the vehicle and gave them his cash and several bars of Xanax. They then searched the car and took the hooded sweatshirt and shorts that Wallace was wearing,

---

[6]Mann's nickname was "Dallas."

[7]Council's nickname was "JT."

5

leaving him in only his tanktop and boxer briefs. Afterward, they let Wallace go, and he returned to his house and put on clothes.

Council, who had pled guilty to the Wallace Robbery and received deferred adjudication community supervision, testified that he, Booker, and Brown were involved in that robbery. According to Council, he pulled up in the car with Wallace, and Mann got in the back seat and handed Wallace a handgun. Booker walked up to Wallace's window, grabbed something Wallace was holding, and told him to get out of the car. Council then searched the car and grabbed the handgun while Booker strip-searched Wallace. Council did not remember seeing Booker or Brown with a gun but thought that Booker had a gun at his side.

Brown testified that he did not know anything about the Wallace Robbery, denied any involvement, and denied that he was present at the robbery. However, in a portion of his recorded interview with law enforcement shown to the jury, Brown said that he and Booker were present at the Wallace Robbery.

Morris testified that Booker told him that, after he robbed and stripped down Wallace, Wallace cried, begged, and peed all over himself. He also said that Booker thought that was funny.

In his interview, Booker initially denied any involvement in the Wallace Robbery. Later in the interview, Booker admitted that he was at that robbery, denied that he had a firearm, and maintained that Council and Brown both had firearms.

**D.      The Mann Murder and the Wallace Assault**

The fifth count in the indictment alleged that Booker murdered Mann (1) by intentionally and knowingly causing Mann's death by shooting him with a firearm, or (2) with intent to cause serious bodily injury to Mann, Booker "commit[ted] an act clearly dangerous to human life that caused the death of [Mann] by discharging a firearm at or in the direction of" Mann (the Mann Murder).  The sixth count alleged that Booker committed the aggravated assault of Wallace by "threaten[ing] [him] with imminent bodily injury by firing a firearm at [him], and used or exhibited" a firearm during the assault (the Wallace Assault).

Wallace testified that he stayed home for ten or fifteen minutes after he was robbed by Booker, then went out again.  He went to a hangout spot on Hickory Street, and Mann got into Wallace's car when he arrived.  While they were talking, Wallace observed in his car's mirror that Booker and Brown were approaching from behind.  Because of the earlier incident with them, Wallace drove off and then heard gunfire coming from behind him.  Two of the shots hit his car, but he did not look to see who was shooting.  When he got to his house, he discovered that Mann, who was in the backseat, had been shot.  Wallace called the paramedics but thought that Mann was dead because he was not moving.[8]  An autopsy determined that Mann died from a 7.62 caliber bullet that entered his left mid-back and lodged in the back of his throat.

The evidence showed that four bullets struck the rear of Wallace's car:  one in the upper right portion of the license plate, one below the license plate, and two in the lower left of the bumper.  A fifth bullet may have creased the top of the car.  In addition, six 9-mm casings,

---

[8]After the shooting, Booker fled to Oklahoma City and was apprehended there within ten days after the shooting.

several 7.62 casings, and a 40-caliber casing were recovered on the roadway of Hickory Street and in the adjacent yard. An analysis by a firearms examiner at the Texas Department of Public Safety determined that a Bersa pistol that had been recovered had fired four of the 9-mm casings and that the Glock pistol that Booker had stolen from Bailey eight days earlier had fired two of the 9-mm casings.[9] The examiner opined that the 7.62-caliber bullet recovered from Mann's body was fired from an SKS or an AR-style rifle.

Leigh Foreman, the lead detective on the case, testified that Brown admitted shooting the round that killed Mann from an SKS rifle. He also testified that, immediately after the shooting, Booker fled from Paris and was apprehended in Oklahoma City within a week. Darrien Richards, an officer with the Oklahoma City Police Department, testified that, in January 2023, he recovered a Glock 26 pistol in a traffic stop. Upon investigation, he determined that the Glock pistol had the same serial number as a Glock pistol reported stolen in Paris in 2021. He identified State's exhibit 23 as the Glock pistol he recovered in the traffic stop.

At trial, Brown admitted that he shot at Wallace,[10] but killed Mann, with an SKS rifle. He did not know how many rounds he fired. Although he admitted Booker and Council were with him, he maintained that Booker did not fire any shots. Nevertheless, he acknowledged that he told the detective in his interview that Booker "could have shot once or twice" but also maintained that he was not sure if Booker fired a shot. Brown also testified that he had written

---

[9]The Glock stolen from Bailey was recovered in a traffic stop in Oklahoma City in January 2023.

[10]Brown had previously been convicted of Mann's murder and received testimonial immunity.

an affidavit while in jail that stated that Booker was not involved in Mann's murder and that Brown took full responsibility for the murder.

In his interview with law enforcement, Brown said that everyone brought their own gun and that he thought Booker fired an automatic handgun more than once. He also said that he heard Booker fire one shot and that the shooting was over in a matter of seconds.

In McCuin's interview, he told the detective that, after the Wallace Robbery, Wallace went to Big Gerald's, where they roll dice, and that Wallace was mad and told everyone that they, meaning Booker and Brown, robbed him. Somebody called Booker, then Booker called McCuin and asked him to "go slide with [him]" on Wallace. McCuin told him he could not because Wallace raised him. McCuin explained that "go slide" meant to go ride and shoot somebody.

Regarding the Mann Murder and the Wallace Assault, Morris testified that Booker told him that two shell casings found at the scene matched his gun and that four shell casings did not. Booker also told him that he fired a couple of times into Wallace's car.

## II. Standard of Review

Booker's first three issues assert jury-charge error. "We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

"[T]he jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." *Id.* (alteration in original) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.13). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Id.* (quoting *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14)). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Lee*, 415 S.W.3d at 917).

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Id.* at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse [the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)). "In making this determination, we review 'the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole.'" *Id.* (quoting *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed)). "Direct evidence of harm is not required to establish egregious harm." *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996)). That said, "the record must show that a defendant has suffered actual, rather than merely theoretical, harm from

10

jury instruction error." *Ngo v. State*, 175 S.W.3d 738, 750 (Tex. Crim. App. 2005) (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)).

## III.    Accomplice-Witness Statements

In his first issue, Booker complains that the trial court reversibly erred when it failed to include accomplice-witness instructions in its jury charge regarding (1) the statements McCuin made to law enforcement and (2) Brown's testimony and the statements he made to law enforcement.    Because an accomplice-witness instruction relating to McCuin's out-of-court statements was not required and any error related to Brown's testimony was harmless, we will overrule this issue.

### A.    The Law Regarding Accomplice Witnesses

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14.    This rule shows "a legislative determination that accomplice testimony implicating another person should be viewed with a measure of caution, because accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Zamora v. State*, 411 S.W.3d 504, 509–10 (Tex. Crim. App. 2013) (quoting *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998)).

"Because the rule requires corroboration of accomplice-witness testimony before a conviction can stand, the jury must be instructed accordingly." *Id.* at 510.    "For accomplice

11

witnesses as a matter of law,[11] the trial court affirmatively instructs the jury that the witness is an accomplice and that his testimony must be corroborated." *Id.* (citing *Druery v. State*, 225 S.W.3d 491, 498–99 (Tex. Crim. App. 2007)). "A witness is an accomplice as a matter of law when the witness has been charged with the same offense as the defendant or a lesser-included offense, or 'when the evidence clearly shows that the witness could have been so charged.'" *Id.* (quoting *Druery*, 225 S.W.3d at 498). Further, since the accomplice-witness rule is the law applicable to the case, an accomplice-witness instruction is required to be given sua sponte if the evidence shows that a witness is an accomplice. *Id.* at 513–14.

### B. An Instruction Was Not Required Regarding McCuin's Out-of-Court Statements

The record shows that, although McCuin was called as a witness by the State and granted testimonial immunity, he refused to answer any questions. As a result, he did not provide any testimony against Booker, and Booker does not assert any complaint about McCuin's in-court testimony. Rather, he points to McCuin's out-of-court interview with law enforcement and complains that the trial court reversibly erred when it failed to give an accomplice-witness instruction regarding the statements made in that interview.

However, only an accomplice's in-court testimony is required to be corroborated under Article 38.14. *Bingham v. State*, 913 S.W.2d 208, 210 (Tex. Crim. App. 1995). For that reason, an accomplice witness's out-of-court statements are not subject to the Article 38.14 corroboration requirement. *Id.* at 213. Further, because McCuin's interview with law

---

[11]Booker asserts, and the State does not dispute, that McCuin was an accomplice as a matter of law as to the Morrison/Jackson Robbery and that Brown was an accomplice as a matter of law as to the Mann Murder and the Wallace Assault.

enforcement was admitted without objection, "the jury was entitled to regard it as independent evidence of [Booker's] guilt." *Archie v. State*, 340 S.W.3d 734, 737 n.3 (Tex. Crim. App. 2011).

Because the trial court was not required to give an accomplice-witness instruction regarding McCuin's interview with law enforcement, we overrule Booker's first issue, insofar as it relates to McCuin's interview.

### C. Booker Was Not Egregiously Harmed by the Absence of an Accomplice-Witness Instruction Relating to Brown's Testimony

Booker also contends that the trial court erred when it failed to include an accomplice-witness instruction relating to Brown's testimony and law enforcement interview. Because Brown's out-of-court statements to law enforcement are not subject to the Article 38.14-corroboration requirement, we overrule Booker's first issue insofar as it relates to Brown's law-enforcement interview. *See Bingham*, 913 S.W.2d at 213.

At trial, Brown took responsibility for the Mann Murder, downplayed Booker's involvement in the Mann Murder and the Wallace Assault, and offered equivocal testimony regarding whether Booker had a gun or shot at Wallace. Because some of his testimony may have implicated Booker in those crimes, we assume, without deciding, that the trial court erred when it failed to include an accomplice-witness instruction regarding Brown and determine whether Booker was harmed by the error. *See* TEX. R. APP. P. 44.2(b).

#### 1. Standard of Review

Since Booker did not object to the absence of an accomplice-witness instruction, the trial court will be reversed "only in the event that the record demonstrates that the error resulted in egregious harm." *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012) (citing

*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State*, 758 S.W.2d 787 (Tex. Crim. App. 1988)). Under this standard, "non-accomplice evidence can render harmless a failure to submit an accomplice[-]witness instruction by fulfilling the purpose an accomplice[-]witness instruction is designed to serve." *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002). However, egregious harm will be found when "the 'jurors would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Casanova*, 383 S.W.3d at 533 (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

"To evaluate the [strength] of corroborat[ing] evidence, we eliminate the accomplice-witness testimony[12] from our consideration and examine the non-accomplice evidence 'to ascertain if there is evidence which tends to connect the accused with the commission of the offense.'" *Rhymes v. State*, 536 S.W.3d 85, 92 (Tex. App.—Texarkana 2017, pet. ref'd) (quoting *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997)). "The non-accomplice evidence need not establish guilt beyond a reasonable doubt or directly link the defendant to the crime." *Id.* at 93 (citing *Hernandez*, 939 S.W.2d at 176).

"[E]vidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Gill v. State*, 873 S.W.2d 45, 49 (Tex. Crim. App. 1994) (citing *Cockrum v. State*, 758

---

[12]Although Brown's out-of-court interview with law enforcement is not required to be corroborated and "the jury was entitled to regard it as independent evidence of [Booker's] guilt," it may not be used to corroborate Brown's in-court testimony under Article 38.14. *Archie*, 340 S.W.3d at 737 n.3; *see Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).

S.W.2d 577, 581–582 (Tex. Crim. App. 1988)). Although evidence that shows only motive or opportunity to commit the crime is, by itself, insufficient to corroborate accomplice-witness testimony, it may "be considered in connection with other evidence tending to connect the accused with the crime." *Reed v. State*, 744 S.W.2d 112, 127 (Tex. Crim. App. 1988) (citing *Paulus v. State*, 633 S.W.2d 827, 846 (Tex. Crim. App. [Panel Op.] 1981) (op. on reh'g.).

"Whether error in failing to submit an accomplice-witness instruction will be deemed harmful is . . . a function of the strength of the corroborating evidence." *Casanova*, 383 S.W.3d at 539. "The strength of that evidence is, in turn, a function of (1) its reliability or believability and (2) how compellingly it tends to connect the accused to the charged offense." *Id.*

### 2.      Analysis

Wallace testified that, earlier on the evening of September 28, Booker and Brown robbed him at gunpoint and that both Booker and Brown pointed firearms at him. He also testified that, when he was in his car with Mann on Hickory Street, he saw Booker and Brown approaching the rear of his car and, because of the robbery earlier that evening, he drove away. While driving away, he heard gunshots coming from behind the car. The bullet that killed Mann was a 7.62 caliber bullet. Foreman testified that Brown admitted shooting the round that killed Mann from an SKS rifle. At the scene, in addition to 7.62-caliber casings, six 9-mm shell casings were recovered, two of which were fired from the Glock pistol that Booker had stolen from Bailey a week earlier. The evidence also showed that, immediately after the shooting, Booker fled to Oklahoma City, where he was apprehended within ten days. Bailey's Glock was recovered in a traffic stop in Oklahoma City about sixteen months later. Finally, in his interview, McCuin said

15

that, shortly before the shooting, Booker called him and asked him to come with him to shoot Wallace.

We find that this evidence is reliable, shows that Booker intended to shoot Wallace, and compellingly tends to connect Booker to the Mann Murder and the Wallace Assault. As a result, we hold that the trial court's error, if any, was harmless. We overrule Booker's first issue, insofar as it relates to Brown's testimony.

## IV. Jailhouse-Witness Testimony

Booker contends in his second issue that the trial court erred when it failed to include a jailhouse-witness instruction relating to Morris's testimony in its jury charge. The State does not contest that the trial court erred but contends that Booker was not egregiously harmed.[13] We assume, without deciding, that the statements made to Morris were against Booker's interest and that the trial court erred when it did not include a jailhouse-witness instruction.

### A. The Law Regarding Jailhouse-Witness Testimony

Like an accomplice witness,

> [a] defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

TEX. CODE CRIM. PROC. ANN. art. 38.075(a). "Corroboration is not sufficient . . . if the corroboration only shows that the offense was committed." TEX. CODE CRIM. PROC. ANN. art. 38.075(b).

---

[13]Booker did not object to the trial court's failure to include a jailhouse-witness instruction.

16

"[T]he standard for corroboration of jailhouse[-witness] testimony under Article 38.075 is the same as the standard for corroboration of accomplice-witness testimony under Article. 38.14." *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd).  Using this standard, we "eliminate the [jailhouse-witness] testimony . . . and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the offense." *Id.* (citing *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993)).  As with accomplice-witness testimony, "[w]hether error in failing to submit a[] [jailhouse]-witness instruction will be deemed harmful is . . . a function of the strength of the corroborating evidence." *Casanova*, 383 S.W.3d at 539.  "The strength of that evidence is, in turn, a function of (1) its reliability or believability and (2) how compellingly it tends to connect the accused to the charged offense." *Id.*

### B.     Analysis

Booker asserts that Morris's testimony regarding Booker's statements to Morris implicated him in the Mann Murder and the Wallace Assault and, arguably, in the Morrison/Jackson Robbery.[14]  Based on the evidence and our conclusion set forth in our analysis of Booker's issue with Brown's accomplice-witness testimony, we find that the trial court's error was harmless, insofar as it relates to the Mann Murder and the Wallace Assault.

Regarding the Morrison/Jackson Robbery, in his interview with law enforcement, McCuin detailed how he communicated with Booker by text messages and conspired with him to rob Morrison of his firearm through the use of a deadly weapon by Brown.  McCuin also stated

---

[14]Booker does not complain about Morris's testimony implicating him in the Wallace Robbery.

17

that he removed Morrison's firearm from Morrison's car and got into a car driven by Booker's girlfriend. In his interview with law enforcement, Booker did not deny that he and Brown were in the car at McCuin's house, and Booker identified his girlfriend as the driver of the car. He also confirmed that he was communicating with McCuin through text messages and, consistent with McCuin's statement, confirmed the events that took place at McCuin's house.

We find that this evidence is reliable, shows that Booker was an active participant in the planning and execution of the Morrison/Jackson Robbery, and compellingly tends to connect him to that robbery. For that reason, we find that the trial court's error, insofar as it relates to the Morrison/Jackson Robbery, was harmless. We overrule Booker's second issue.

## V. The Jury Charge Adequately Set Forth the Required Intent for Party Liability

In his third issue, Booker contends that the trial court erred when it failed to instruct the jury that it must find he had a specific intent to commit the murder of Mann and the aggravated assault of Wallace. Booker argues that, by not including language in the application paragraphs directly applying the "'intent to promote or assist' theory of party liability,"[15] the charge allowed him to be convicted of murder and aggravated assault as a party on the lesser mens rea that he acted knowingly. Thus, Booker contends that the charge permitted convictions on findings that he was aware that Mann was reasonably certain to die as a result of Brown's conduct, rather than that he intended Mann's death, and likewise, that he knew that Brown's conduct would threaten Wallace, rather than that he intended Brown's conduct to threaten Wallace. Because we find no error in the application paragraphs, we will overrule this issue.

---

[15]*Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013).

Whenever jury-charge error is asserted, "[o]ur first inquiry is whether the jury charge contained error." *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171). We do so by examining the relevant portions of the jury charge. *Id.* at 440–443.

**A. The Party-Liability Instruction in the Abstract Portion of the Jury Charge Was Correct**

Although the Texas Penal Code contains three theories of party liability,[16] the abstract portion of the jury charge contained only the "intent to promote or assist" theory of party liability, as follows:

> A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or both.

> Each party to an offense may be charged with the commission of the offense.

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

> Mere presence alone will not constitute one a party to an offense.

*See* TEX. PENAL CODE ANN. § 7.02(a)(2). In *Nava*, the Texas Court of Criminal Appeals examined a similar instruction when given in a felony-murder case. *Nava*, 415 S.W.3d at 298. The court noted that "the 'intent to promote or assist' theory of party liability" given in the abstract portion of the jury charge "was correct" because "[i]t required the State to show that appellants intended to promote or assist the commission of felony murder before convicting of

---

[16]*See* TEX. PENAL CODE ANN. § 7.02(a) (Supp.).

19

felony murder under this theory of party liability." *Id.* at 298. It explained that "[t]he words 'acting with intent to promote or assist the commission of the offense' clearly mean, at a minimum, that a defendant must act intentionally with respect to the result elements of a result-oriented offense." *Id.* at 298–99 (quoting *Kelly v. State*, 669 S.W.2d 720, 725 n.7 (Tex. Crim. App. 1984)).

Because murder is a result-oriented offense, the court also explained that the "intent to promote or assist" theory of party liability contained in Section 7.02(a)(2), combined with the felony-murder statute,[17] "requires an intent to promote or assist, not only the commission of the underlying felony and the unreasonably dangerous act, but also the result of the offense of felony murder—the death of an individual." *Id.* at 299–300. The court concluded, "The abstract portion of the 'intent to promote or assist' instructions in this case did this. It told the jury that, in order to find appellants guilty, it had to find that they intended the victim's death." *Id.* at 300.

Likewise, in this case, the trial court correctly instructed the jury under the "intent to promote or assist" theory of party liability. As in *Nava*, this instruction required that, in order to convict Booker as a party, the jury must find that he intended to promote or assist the commission of the offense. As applied to the murder charge, this required that the jury find that Booker "act[ed] intentionally with respect to the result elements of" murder, i.e., he intended the victim's death. *Id.* at 298.

Aggravated assault by threat, as alleged in the State's indictment, is a conduct-oriented offense. *Ex parte Rion*, 662 S.W.3d 890, 900 n.12 (Tex. Crim. App. 2022) (citing *Landrian v.*

---

[17]TEX. PENAL CODE ANN. § 19.02(b)(3).

*State*, 268 S.W.3d 532, 540 (Tex. Crim. App. 2008)). Because it is conduct oriented, it "focus[es] upon the act of making a threat, regardless of any result that threat might cause." *Id.* (quoting *Landrian*, 268 S.W.3d at 536). Applying *Nava*'s reasoning to a conduct-oriented offense, "[t]he words 'acting with intent to promote or assist the commission of the offense' [in the instruction] clearly mean, at a minimum, that a defendant must act intentionally with respect to the [conduct] elements of a [conduct]-oriented offense." *Nava*, 415 S.W.3d at 298–99 (quoting *Kelly*, 669 S.W.2d at 725 n.7). As applied to the aggravated assault charge in this case, this required the jury to find that Booker acted intentionally with respect to the conduct elements of aggravated assault, i.e., he intended to threaten Wallace with imminent bodily injury by firing a firearm at him.[18]

As a result, the abstract portion of the jury charge required that the jury find that Booker intended to promote or assist the commission of murder and of aggravated assault before convicting him of these offenses under the "intent to promote or assist" theory of party liability.

### B. The Application Paragraphs Necessarily and Unambiguously Referred to the Party-Liability Instruction

Nevertheless, Booker contends that the trial court was required to include an instruction in the application paragraphs of the jury charge that required the jury to find that he acted with the specific intent to promote or assist the commission of these offenses. Booker points to the application paragraph in *Nava*, in which the trial court added the "intent to promote or assist"

---

[18]The abstract portion of the jury charge included an instruction that stated, "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Booker asserts no error regarding this instruction.

instruction at the end of the application paragraph,[19] and contends that there was no such language in this case. Although the trial court did not include the "intent to promote or assist" instruction in the application paragraphs, neither was the trial court required to do so.

"The application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012). For that reason,

> When a definition or instruction on a theory of law—such as the law of parties— is given in the abstract portion of the charge, the application paragraph must
>
> > (1)    specify "all of the conditions to be met before a conviction under such theory is authorized";
> >
> > (2)    authorize "a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers"; or
> >
> > (3)    "contain[] some logically consistent combination of such paragraphs."

*Id.* at 367 (footnotes omitted) (citations omitted). "Thus, if the application paragraph 'necessarily and unambiguously' refers to another paragraph of the jury charge, then a conviction is authorized, and the trial judge need not *sua sponte* 'cut and paste' that definition into the

---

[19]The application paragraph on the "intent to promote or assist" theory of party liability in *Nava* provided:

> Now, if you find from the evidence beyond a reasonable doubt that . . . [a co-defendant committed felony murder], and that the defendant . . . with the intent to promote or assist the commission of *the offense*, if any, solicited, encouraged, directed, aided or attempted to aid [co-defendant] and/or [another co-defendant] to commit *the offense* . . . [then you will find the defendant guilty of murder].

*Nava*, 415 S.W.3d at 294 (second alteration in original).

22

application paragraph." *Id.* (citing *Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997)). For that reason, "a general reference to the law of parties in the application paragraph is sufficient and is not error when the defendant does not object and request a narrowing of the specific statutory modes of conduct that constitute party liability." *Id.* at 368 (footnote omitted) (citation omitted).

In this case, both of the application paragraphs instructed the jury to "bear[] in mind the foregoing instructions," then authorized a conviction of Booker "acting alone or as a party."[20] Because the jury was instructed to bear in mind the prior instructions in the charge and was authorized to convict Booker as a party, the application paragraphs necessarily and unambiguously referred the jury to the "intent to promote and assist" instructions on party liability. As a result, the jury was directed to refer to the abstract instructions on the law of

---

[20]The application paragraphs on the murder charge provided:

> Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about September 28, 2021, in Lamar County, Texas, the Defendant, Xaiver Jamall Booker, did then and there, acting alone or as a party, intentionally or knowingly cause the death of an individual, namely Keith Mann[,] by shooting Keith Mann with a firearm, or

> If you find from the evidence beyond a reasonable doubt that on or about September 28, 2021 in Lamar County, Texas, the Defendant, Xaiver Jamall Booker, did then and there, acting alone or as a party, with intent to cause serious bodily injury to an individual, namely Keith Mann, hereafter styled the complainant, commit an act clearly dangerous to human life that caused the death of the complainant by discharging a firearm at or in the direction of Keith Mann, then you will find the Defendant *Guilty* of the offense of Murder as charged in Count Five [of] the Indictment.

The application paragraph on the aggravated assault charge provided:

> Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about September 28, 2021, in Lamar County, Texas, the Defendant, Xaiver Jamall Booker, did then and there, acting alone or as a party, intentionally and knowingly threaten Jquarius Wallace with imminent bodily injury by firing a firearm at Jquarius Wallace, and used or exhibited a deadly weapon, namely a firearm, during the commission of the assault., then you will find the Defendant *Guilty* of the offense of Aggravated Assault with a Deadly Weapon as charged in Count Six of the Indictment.

23

parties, which included that he "act[ed] with intent to promote or assist the commission of the offense," to determine whether Booker was liable as a party.

For that reason, we find that the jury charge adequately instructed the jury that it was required to find that Booker intended to promote or assist the commission of murder and of aggravated assault before convicting him of these offenses as a party. We overrule this issue.

## VI. Booker Has Not Shown Cumulative Error

In his final issue, Booker contends that the cumulative effect of his asserted errors undermined his right to due process and tainted all of his convictions. "It is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999). We assumed, without deciding, that the trial court erred in failing to include a jailhouse-witness instruction and that the trial court erred in failing to give an accomplice-witness instruction regarding Brown's testimony. In each of those contexts, other reliable evidence that tended to connect Booker to the offense eviscerated any harm from the failure to include those instructions. As a result, Booker has not shown cumulative error. *See Feldman v. State*, 71 S.W.3d 738, 748, 757 (Tex. Crim. App. 2002), *superseded on other grounds by statute*, TEX. CODE CRIM. PROC. ANN. art. 37.071, *as recognized in Coleman v. State*, No. AP-75,478, 2009 WL 4696064, at \*11 (Tex. Crim. App. Dec. 9, 2009) (per curiam) (not designated for publication)). We overrule this issue.

24

## VII. Disposition.

For the reasons stated, we affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:  January 17, 2024
Date Decided:   February 28, 2024

Do Not Publish